In the Matter of the arbitration between ANDROS COMPANIA MARITIMA, S.A., as Disponent Owners of the KISSAVOS, Petitioner-Appellee,

and

MARC RICH & CO., A.G., as Charterers, Respondent-Appellant.

No. 865, Docket 78–7019.

United States Court of Appeals, Second Circuit.

Argued May 3, 1978.

Decided June 7, 1978.

Robert F. Fink, New York City (Milgrim Thomajan & Jacobs, George L. Graff, New York City, of counsel), for respondent-appellant.

Raymond A. Connell, New York City (Healy & Baillie, Nicholas J. Healy, New York City, of counsel), for petitioner-appellee.

Before FEINBERG and MESKILL, Circuit Judges, and PORT, District Judge.*

FEINBERG, Circuit Judge:

This appeal raises interesting questions concerning an arbitrator's duty under *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), to disclose information

---

* Hon. Edmund Port, District Judge of the Northern District of New York, sitting by designation.

that might create an impression of bias. The losing party in an arbitration proceeding, Marc Rich & Co., A.G., appeals from a judgment of the United States District Court for the Southern District of New York, Charles L. Brieant, J., confirming the arbitration award and directing Marc Rich to pay Andros Compania Maritima, S.A. the sum of $109,028.40. Marc Rich argues that the district judge denied it an adequate opportunity to present its claim that the arbitrators had not made the required full disclosure. Appellant also contends that the arbitration award should not be enforced, because it disregards the essence of the agreement between the parties. For reasons indicated below, we reject these contentions and affirm the judgment of the district court.

## I

The controversy arises out of a charter party, dated at London, July 30, 1974, between Andros as "disponent owner" of the tanker Kissavos[1] and Marc Rich, under which the latter chartered the tanker to carry a cargo of crude oil from West Africa to two ports on the Peruvian coast. Marc Rich agreed to pay demurrage (charges for excessive time used by the charterer in loading and discharging cargo) at a rate of $5,606.25 per day for all time expended in

excess of allowed laytime of 72 hours. In accordance with instructions, the vessel carried the cargo to Peru, but was kept at the two ports well beyond the allowed laytime. Because of the delay, Andros claimed $116,037.70 in demurrage against Marc Rich, which made partial payment but disputed its liability for the balance, some $90,000.

In early 1975, under the arbitration clause of the charter,[2] Andros appointed Mr. Philip Moyles and Marc Rich named Captain George Stam as arbitrators. They, in turn, selected Mr. Manfred Arnold, manager of the Maritime Division, National Bank of North America, as the chairman of the arbitration panel. Captain Stam died before the arbitration commenced, and Marc Rich selected Mr. Jack Berg in his place.

At the first arbitration hearing, which Moyles was unable to attend, both Berg and Arnold made preliminary statements, apparently with a view toward complying with the Maritime Arbitration Rules of the Society of Maritime Arbitrators, Inc. (1974) (the Rules).[3] Their disclosures were as follows:

"Mr. Berg. I am personally familiar with Andros Compania Maritima. As a matter of fact, this afternoon I have been chairman of an arbitration panel in which they

---

1. A "disponent owner" does not hold legal title to a vessel, but for purposes of the charter party acts as if he does.

2. The portion of the arbitration clause relevant to this appeal provides:
    ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final.
   The charter specified New York City as the place of arbitration.

3. Section 9 of the Rules provides:
    Disclosure By Arbitrator(s) of Disqualifying Circumstances—Preferably at the time of receiving his notice of appointment, but not

later than the commencement of the first hearing, a prospective Arbitrator is required to disclose any circumstance tending to raise a presumption of bias or which he believes might disqualify him as an impartial Arbitrator including close personal ties or business relations with any one of, (a) either of the parties (b) other affiliates of the parties, (c) with counsel for either party, or, (d) with the other Arbitrators on the panel.
    Upon receipt of such information, the parties shall declare if willing to proceed under the circumstances disclosed. If either party declines to waive a presumptive disqualification, the vacancy thus created shall be filled in accordance with the applicable provisions of these Rules.
Andros claims that it did not agree that the Rules applied to this proceeding, and points out that the arbitration clause, see note 2 supra, does not refer to them. We do not regard the issue as significant.

were one of the disputants. I don't recognize Marc Rich & Company at all.

"I am a corporate officer of Continental Grain Company and it is possible that in the course of their day-to-day business they have had business connections with either or both of these parties, and, as a matter of fact, it is possible that they have had business dealings with Andros in the past.

"I have never been personally involved in any of these business arrangements nor have had any problems which may have arisen from them. I know both attorneys here today. I have been appointed to arbitration [panels] in which they have represented disputants [before] the Panel. I have been appointed by both on various occasions. As far as I know my firm has had no business connections with either of the law firms involved here today.

"I have sat on a number of panels with Mr. Arnold in the past, and I know him quite well personally. We are both on the Board of Governors of the Society of Maritime Arbitrators."

"I do not know Mr. Moyles. I don't believe we have ever met although I would reserve judgment until after I see him."

"I know no other reason why I could not sit on this Panel and render a fair and impartial decision based on the evidence presented here."

* * * * * *

"The Chairman [Mr. Arnold]. I have not had any business dealings with the owners in this case. I have been involved in arbitrations and I was appointed by Andros as arbitrator.

"I do not recognize the name of Charterers, Marc Rich. It could possibly be that my employer, National Bank of North America, might have had [some] dealings with either party of which, however, I would be unfamiliar and actually had no participation in.

"As far as the attorneys are concerned, this is the first time I meet Mr. Thomajan. I have not had any dealings with [his] firm.

"I have been involved in various arbitrations and I am still involved with arbitrations in which the firm of Healy & Baillie is representing disputants.

"Mr. Berg has commented on our acquaintance. As to Mr. Moyles, I have known Mr. Moyles for possibly five or six years, stemming from the time when he was with Haight, Gardner and I was involved in an arbitration in which Mr. Moyles represented a disputant. Neither I nor my employer had had any business dealings with [his] law firm as such.

"I do not feel that any connection or relation which might exist would impede me from hearing this case and rendering a just and fair award."

After each arbitrator finished, the attorney for Marc Rich stated that he had no questions or objections. The attorney for Andros made a similar statement.

At the beginning of the second hearing,[4] Moyles stated:

"I am a member of the firm of Freehill, Hogan & Mahar. Prior to joining that firm in January of this year I was a member of Fuller, Lawton & Moyles.

"At the time that I was appointed arbitrator, I was with the Fuller, Lawton & Moyles firm; although I think all the documents at the first hearing were held subsequent to my joining the Freehill firm as partner.

"I know Mr. Connell on a professional basis, having had cases against his firm over the years. I know Mr. Arnold, having had cases where I presented matters to arbitrations of which he was a member. And I have a case presently pending on behalf of a client before a panel of arbitrators of which Mr. Berg is a member.

"I do not know either of the parties to this dispute and I have never represented either party to this suit.

"Prior to our convening here today, I had not met with Mr. Thomajan or Mr.

---

4. It had been stipulated that the first hearing would proceed without Moyles, but that only documents would be presented, which would be made available to him.

Langlios [attorney assisting Mr. Thomajan] or the young lady with them, Miss Haskins."

"I know of no reason why I cannot sit as a member of this panel, and I know of no reason why I cannot make a true and honest determination based upon the testimony and documents presented by each side with respect to the dispute."

Again, Marc Rich's counsel (as well as Andro's) had no questions or objections.

At the arbitration hearings, we are told, Andros produced two witnesses and submitted 67 exhibits; Marc Rich produced no witnesses and 15 exhibits. The principal focus of the controversy was whether the conceded delay in unloading the tanker had been caused by a deficiency in the ship's discharge pumps or by other causes for which the ship could not be held responsible. In an award dated September 30, 1977, Arbitrators Arnold and Moyles found in favor of Andros for the entire balance due ($88,178.97 plus $20,849.43 interest) for a total of $109,028.40. Arbitrator Berg dissented in part.[5]

In October 1977, Andros petitioned the district court for an order confirming the arbitration award. Shortly thereafter, without making a motion to vacate or challenge the award, Marc Rich noticed depositions of all three arbitrators, to be held eight days later in the office of counsel for Marc Rich. The notices did not indicate why the arbitrators were being summoned for examination, except that the notice to Arnold warned that Marc Rich intended to subpoena the following:

All documents in [Mr. Arnold's] possession, custody or control, evidencing or reflecting business dealings and social relationships between [Mr. Arnold] or his employer, National Bank of North America, and Orion & Global Chartering Co., Inc., and any of its affiliated companies or Lloyd C. Nelson.

At the time, Lloyd C. Nelson was president of Orion & Global Chartering Co., Inc., the New York brokers and agents for Andros, which in turn was the managing agent for the registered owners of the Kissavos.[6]

The matter was assigned to Judge Brieant, and with commendable dispatch the judge called the attorneys before him to cut through a potentially complicated procedural tangle. The subpoenas were quashed, and Marc Rich was directed to move to vacate the arbitration award. The judge advised the parties that if the papers revealed "a legitimate disputed factual issue" concerning the adequacy of disclosure, Mr. Arnold would be called to testify in court under the judge's "direct supervision and control and briefly and quickly . . . ."

In short order, Marc Rich did move to vacate. On the issue of disclosure, it submitted affidavits of its lawyers, one from George L. Graff, who did not participate in the arbitration proceeding, and the other from Robert Thomajan, who represented Marc Rich at the arbitration. The Graff affidavit alleged that

we have recently learned that Mr. Arnold has had a close personal and professional relationship with Lloyd C. Nelson, one of the principals of Orion & Global, the firm which actually operates the vessel.

The Thomajan affidavit alleged:

I discussed the [arbitration] decision, after it came down, with our client and with members of the maritime community. In the course of the inquiry, I learned that Mr. Nelson and Mr. Arnold were close friends and served together on many panels. That relationship was never disclosed nor hinted at in the course of the arbitration proceeding.

Only the Graff affidavit purported to disclose any concrete basis for the claims that Arnold and Nelson "were close friends" or had "a close personal and professional relationship":

5. Mr. Berg construed the evidence before the panel to demonstrate that the Kissavos was "deficient in her pumping capacity," with the result that "it necessarily follows that the delay or time lost from this deficiency should proper-

ly be deducted from used laytime" as part of the demurrage calculation.

6. Cf. note 1 supra.

Following [the arbitration award], we undertook an exhaustive review of approximately 1200 published awards of the Society of Maritime Arbitrators.

Our review of those awards indicated that Mr. Arnold has sat as the neutral arbitrator on 19 panels since 1975. In 12 of those cases, one of the arbitrators who selected him was Lloyd C. Nelson. Of the remaining cases, one involved Andros—the same owner as in this case—and, in another, Healy & Baillie also represented the owner and the charterer defaulted.

In all but one of the cases in which Mr. Arnold was chairman and Mr. Nelson a member (the exception being a case in which the owner admitted liability), Mr. Arnold cast his vote, and carried the panel for the party who nominated Mr. Nelson. Indeed, in each of the 19 occasions when they have sat together on the same panel, Mr. Nelson and Mr. Arnold have voted together.

Needless to say, it would be impossible—and unnecessary—to establish that Mr. Arnold's vote in the instances in which Mr. Nelson was involved was influenced by Mr. Nelson. Yet, an adversary party of Mr. Nelson's would certainly want to know of such a relationship before submitting his case to Mr. Arnold as the neutral chairman.

We have no desire, nor do we, accuse Mr. Arnold of bias or improper conduct. It is precisely to avoid the need to consider such unseemly questions that the Supreme Court has established the *Commonwealth Coatings* requirement for complete disclosure before the arbitration takes place.

In reply, Andros submitted affidavits of its counsel, Raymond A. Connell, and of Lloyd C. Nelson, president of Orion. These affidavits stated—and it now seems conceded—that Orion is the agent for Andros in the United States and has been for more than 20 years;[7] that Nelson has no equity interest in Orion but has been in its employ for over 28 years, and is currently its president; that Orion appointed the local port agents for the Kissavos in Peru; and that Orion's involvement with Andros was apparent in the papers submitted at the arbitration. More significantly, Nelson swore:

Over the course of more than twenty years I have served as arbitrator in scores of New York maritime arbitrations, and I have been a member of the Society of Maritime Arbitrators for more than 13 years. In my capacity as arbitrator I must have sat on panels with most members of the New York maritime community who are willing to serve as arbitrator and who are chosen to serve by those involved in a maritime dispute. Insofar as the KISSAVOS panel is concerned, both Mr. Jack Berg and Mr. Manfred Arnold are members of the Society of Maritime Arbitrators and I have served on many panels with both of those arbitrators, and, on occasion, all three of us have sat on the same panel.

I first met Mr. Arnold in or about August of 1973 when we happened to be members of the same arbitration panel, and since then there have been other panels on which we have served together. Insofar as my contact with Mr. Arnold is concerned, it is limited to those instances where we happen to be members of the same panel and to occasions associated with our memberships in the Society of the Maritime Arbitrators. Neither Mr. Arnold nor his employer, National Bank of North America, have any business of financial relationship of whatsoever nature with either Orion or Andros, and insofar as I am aware there is no reasonable potential for such a relationship developing in the future. Moreover, there is no social relationship at all. I have never been to Mr. Arnold's home and he has never been to mine; our wives have never met save for one chance meeting at an affair hosted by the Maritime Law Association two years ago; my calendar indicates that aside from actual arbitration hearings and deliberations, I have had lunch with Mr. Arnold on nine occa-

---

7. This period incorporates services performed by Orion's predecessor company.

sions since January 1st of this year and all nine occasions were either, for the purpose of discussing our Society's work or to deliberate on a decision on an arbitration, and on almost all of these occasions other people were present. In sum, all of my contacts with Mr. Arnold are strictly limited to activity as members of the Society of Maritime Arbitrators, and in this regard I should also note that this is the same contact I have had with Mr. Jack Berg, the arbitrator appointed by Marc Rich, except that I have known Mr. Berg since 1957 and we have sat on arbitration panels together over a much longer period of time than I have done with Mr. Arnold.

On these papers, Judge Brieant found that Marc Rich had failed to raise a genuine factual issue requiring an evidentiary hearing. The judge denied the motion of Marc Rich to vacate the arbitration award and granted that of Andros to confirm it. Marc Rich appealed, claiming, inter alia, that it should have been allowed to depose the arbitrators and that it was entitled to an evidentiary hearing to demonstrate that Arnold's disclosure had been inadequate.[8]

## II

The disclosure issue posed by appellant generates a somewhat unusual request for relief. Marc Rich argues not that it has demonstrated that the arbitration award should be set aside, but only that it was denied a chance to show why this should be done. At first blush, such an approach seems reasonable, particularly in light of the broad discovery usually allowed in the federal courts. We conclude, nevertheless, that the rulings of the district court were correct.

The starting point in any discussion of the issues before us must be *Commonwealth Coatings Corp. v. Continental Casu-*

alty Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), where the Supreme Court for the first time addressed itself to the "requirements of impartiality" in an arbitration proceeding and held that arbitrators must "disclose to the parties any dealings that might create an impression of possible bias." 393 U.S. at 145, 149, 89 S.Ct. at 339. In that case there had been a relationship between the third—and "supposedly neutral"—arbitrator and the successful party in the arbitration: the former had been engaged by the latter "as an engineering consultant" for "fees of about $12,000 over a period of four or five years and the relationship even went so far as to include the rendering of services on the very projects involved in [the arbitration]." 393 U.S. at 146, 89 S.Ct. at 338. The Court held that the arbitrator's failure to disclose these facts justified vacation of the arbitration award.

There was an obvious tension, however, between the plurality opinion of Justice Black[9] and the concurring opinion of Justice White, joined by Justice Marshall. The former relied heavily on the similarity of function linking arbitrators, judges and juries:

> We have no doubt that if a litigant could show that a foreman of a jury or a judge in a court of justice had, unknown to the litigant, any such relationship, the judgment would be subject to challenge. This is shown beyond doubt by *Tumey v. Ohio*, 273 U.S. 510, [47 S.Ct. 437, 71 L.Ed. 749] (1927), where this Court held that a conviction could not stand because a small part of the judge's income consisted of court fees collected from convicted defendants.

393 U.S. at 148, 89 S.Ct. at 339. Justice Black added that

> It is true that arbitrators cannot sever all their ties with the business world, since

---

8. Marc Rich has not pressed a claim, made in the papers submitted to the district court, that Moyles's disclosure was also inadequate.

9. Nominally, Justice Black's opinion represented the views of six justices, since Justice White's concurrence, joined by Justice Mar-

shall, stated that the author was "glad to join my brother Black's opinion," 393 U.S. at 150. However, as explained infra, the two texts cannot be entirely reconciled. Only four justices subscribed without reservation to Justice Black's opinion.

they are not expected to get all their income from their work deciding cases, but we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review.

Id. at 148–49, 89 S.Ct. at 339.

Justice White's concurring opinion, however, took pains to state at the outset:

The Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges. It is often because they are men of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function. . . . This does not mean the judiciary must overlook outright chicanery in giving effect to their awards; that would be an abdication of our responsibility. But it does mean that arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial. I see no reason automatically to disqualify the best informed and most capable potential arbitrators.

393 U.S. at 150, 89 S.Ct. at 340. The concurring opinion continued:

And it is far better that the relationship be disclosed at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his objectivity, than to have the relationship come to light after the arbitration, when a suspicious or disgruntled party can seize on it as a pretext for invalidating the award. The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality. That role is best consigned to the parties who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business.

Of course, an arbitrator's business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people. He cannot be expected to provide the parties with his complete and unexpurgated business biography. But it is enough for present purposes to hold, as the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed. If arbitrators err on the side of disclosure, as they should, it will not be difficult for courts to identify those undisclosed relationships which are too insubstantial to warrant vacating an award.

393 U.S. at 151–52, 89 S.Ct. at 340.

The dissenting opinion of Justice Fortas, joined by Justices Harlan and Stewart, criticized the Court for announcing

a *per se* rule that . . . has no basis in the applicable statute or jurisprudential principles: that, regardless of the agreement between the parties, if an arbitrator has any prior business relationship with one of the parties of which he fails to inform the other party, however innocently, the arbitration award is always subject to being set aside. This is so even where the award is unanimous; where there is no suggestion that the non-disclosure indicates partiality or bias; and where it is conceded that there was in fact no irregularity, unfairness, bias, or partiality.

393 U.S. at 153, 89 S.Ct. at 341. The dissent continued:

I agree that failure of an arbitrator to volunteer information about business dealings with one party will, prima facie, support a claim of partiality or bias. But where there is no suggestion that the nondisclosure was calculated, and where the complaining party disclaims any imputation of partiality, bias, or misconduct, the presumption clearly is overcome.

⋅ ⋅ ⋅ ⋅ ⋅

Arbitration is essentially consensual and practical. The United States Arbitration Act is obviously designed to pro-

tect the integrity of the process with a minimum of insistence upon set formulae and rules. The Court applies to this process rules applicable to judges and not to a system characterized by dealing on faith and reputation for reliability.

393 U.S. at 154–55, 89 S.Ct. at 342.

The diverse views expressed in these opinions pose difficulties in applying the teachings of *Commonwealth Coatings*. It is certainly true, as Justice White's concurrence emphasizes, that the Court did not decide that "the standards of judicial decorum" apply equally to arbitrators. The latter are usually recompensed for their services by the parties, a custom which would be inappropriate for judges. Also, the very practice required of arbitrators in *Commonwealth Coatings* is not now permitted to

federal judges under a recent statute. Generally, a federal judge may not state for the record possible disqualifying circumstances and ask the parties to decide whether they want him to continue.[10] More fundamentally, the parties in a judicial proceeding do not choose their judges, as they do in an arbitration. Nevertheless, one common feature of both the plurality and concurring opinions in *Commonwealth Coatings* is clear. Disclosure by arbitrators should be encouraged; failure to make appropriate disclosure will justify setting aside an award.[11]

The Court has not considered these questions further since *Commonwealth Coatings,* but they have been the subject of appeals before us on a number of occasions. In *Garfield & Co. v. Wiest,* 432 F.2d 849 (2d

10. See 28 U.S.C. §§ 455(b), (e). Cf. Frank, Commentary on Disqualification of Judges—Canon 3C, 1972 Utah L.Rev. 377, 387–88 (comparing such disclosure to "a velvet black jack"). In 1975, the Judicial Conference of the United States amended the Code of Judicial Conduct for United States Judges to strike Canon 3D, which had provided for waiver of disqualification by the parties following judicial disclosure under certain circumstances. See Reports of the Proceedings of the Judicial Conference of the United States 13 (1975). This action was taken to bring the Code "into conformity with the new Judicial Disqualification Statute," cited above. See id. at 12.

11. *Commonwealth Coatings* involved review of an arbitration award pursuant to 9 U.S.C. § 10, which sets out certain preconditions for judicial refusals to confirm awards. Among these is "evident partiality or corruption in the arbitrators, or either of them." Id. § 10(b). The parties in the instant case dispute whether review of their award is governed by that section or by Chapter 2 of the Arbitration Act, 9 U.S.C. §§ 201–208, the so-called Convention on the Recognition and Enforcement of Foreign Arbitral Awards. Article 1 of the Convention renders it applicable to awards "not considered as domestic awards in the State where their recognition and enforcement are sought." Marc Rich argues that, although this case involves two foreign parties, the award at issue was rendered in New York and should be considered domestic, removing it from the reach of the Convention and placing it within the ambit of 9 U.S.C. § 10 for our purposes. Andros disagrees, citing 9 U.S.C. § 202 (which broadly restates the scope of the Convention) and *Antco Shipping Co. v. Sidermar S.p.A.,* 417 F.Supp. 207 (S.D.N.Y.1976), aff'd in open court by oral

opinion, 553 F.2d 94 (2d Cir. 1977) (holding Convention applicable to arbitration agreement between two foreign corporations, although the arbitration was to take place in New York). Our affirmance of *Sidermar* was pursuant to Local Rule § 0.23, and is without precedential effect.

We find this controversy intriguing, but we need not resolve it here. If the Convention applies, a request for confirmation of an arbitral award must be granted unless one of the Convention's grounds for "refusal or deferral of recognition or enforcement of the award" appears. 9 U.S.C. § 207. The only such ground conceivably pertinent to this case is found in Article V, section 2(b): "The recognition or enforcement of the award would be contrary to the public policy of [the forum state]." We have held that this provision "is to be construed narrowly to be applied only where enforcement would violate the forum state's most basic notions of morality and justice." *Fotochrome, Inc. v. Copal Co.,* 517 F.2d 512, 516 (2d Cir. 1975); *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (Rakta),* 508 F.2d 969, 974 (2d Cir. 1974). Certainly the Convention is no more liberal than 9 U.S.C. § 10 on the matter of vacating awards, and since—for reasons developed infra—we find none of appellant's contentions adequate under section 10, resort to the Convention would not alter the result. Cf. *Parsons & Whittemore Overseas Co.,* supra, 508 F.2d at 977 (declining to decide whether a 9 U.S.C. § 10 ground for vacating arbitral awards, arbitrator's "manifest disregard" of applicable law, is subsumed in the Convention's "public policy" reservation, since result would be the same regardless).

Cir. 1970), cert. denied, 401 U.S. 940, 91 S.Ct. 939, 28 L.Ed.2d 220 (1971), we refused to set aside an award despite the failure of the arbitrators to disclose dealings with one of the parties to an arbitration between two member firms of the New York Stock Exchange. The rationale of our holding was that the complaining party had waived any such objections when it joined the Stock Exchange. In *Reed & Martin, Inc. v. Westinghouse Electric Corp.,* 439 F.2d 1268 (2d Cir. 1971), appellant claimed that the award was invalid because Westinghouse's appointee to the arbitration was affiliated with a law firm that had had "dealings with General Electric Company and the latter had been litigating contract clauses identical or similar to those involved in the present case." 439 F.2d at 1275. Pointing out that "the burden of proof . . . rests upon the party asserting bias," id., we held that the failure to disclose this information did not nullify the award.

Similarly, in *Cook Industries, Inc. v. C. Itoh & Co. (America) Inc.,* 449 F.2d 106 (2d Cir. 1971), cert. denied, 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972), one of the arbitrators was an employee of a company that had sold substantial amounts of grain to Itoh, a fact which the arbitrator did not disclose. We upheld the arbitration award since there was "nothing in the record which suggests the existence of any extraordinary secret deal between [Itoh] and [the arbitrator's] employer." 449 F.2d at 108. We emphasized that we have given "practical meaning" to the *Commonwealth Coatings* principle of disclosure by treating "the obligation to which arbitrators are subject as being to disclose dealings of which the parties cannot reasonably be expected to be aware . . . ." Id.

Indeed, we can find only one instance after *Commonwealth Coatings* where an appellant had any success in this court on a claim of insufficient disclosure.[12] In *Sanko S.S. Co. v. Cook Industries, Inc.,* 495 F.2d 1260 (2d Cir. 1973), Sanko claimed that the chairman of the arbitration panel should have disclosed two relationships: one, with a company which, like Cook, was "one of the few major world grain dealers" and with whom it arranged " 'swaps' and 'sales' from time to time running into the millions of dollars," id. at 1262, and the other, with Cook's attorney in the arbitration. We did not set aside the award, however, but remanded the case to the district court to explore these matters further at an evidentiary hearing. We distinguished the decisions in *Garfield & Co. v. Wiest,* supra, and *Cook Industries v. C. Itoh & Co.,* supra, on the ground that unlike those cases

> the record in the present case, as it now stands, does not justify a holding that Sanko knew or should reasonably have known, of the undisclosed dealings.

495 F.2d at 1265.

These decisions demonstrate that we have viewed the teachings of *Commonwealth Coatings* pragmatically, employing a case-by-case approach in preference to dogmatic rigidity. It is certainly fair to say that we have not been quick to set aside the results of an arbitration because of an arbitrator's alleged failure to disclose information.

The reasons for this are not hard to identify. There is an obvious possibility, alluded to by Justice White in *Commonwealth Coatings* that "a suspicious or disgruntled party can seize" upon an undisclosed relationship "as a pretext for invalidating the award." 393 U.S. at 151, 89 S.Ct. at 340. Courts are usually reluctant to impugn the decisions of a jury because of claims of subsequently discovered bias, see *King v. United States,* (2d Cir. 1978) (citing cases), and challenges to a judge's impartiality are typically ruled untimely when the complaining party delays an objection past the point at which he is deemed on notice of potentially disqualifying circumstances. See *United States v. Patrick,* 542 F.2d 381, 390 (7th Cir. 1976), cert. denied, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977) (citing cases); *Satterfield v. Eden-*

---

12. Nor, as far as we can determine, have any such cases been reported from other federal courts.

*ton-Chowan Board of Education,* 530 F.2d 567, 574 & n.21 (4th Cir. 1975) (citing cases). Surely, even greater caution is justified when the decision to be set aside is the product of the theoretically informal, speedy, and inexpensive process of arbitration, freely chosen by the parties. Moreover, a principal attraction of arbitration is the expertise of those who decide the controversy. Expertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it, and the dividing line between innocuous and suspect relationships is not always easy to draw. But as Justice White recognized, an arbitrator "cannot be expected to provide the parties with his complete and unexpurgated business biography." 393 U.S. at 151, 89 S.Ct. at 340. The very intimacy of the group from which specialized arbitrators are chosen suggests that the parties can justifiably be held to know at least some kinds of basic information about an arbitrator's personal and business contacts.

■ With these precedents and observations in mind, we turn to the record before us. Marc Rich alleged in the district court that Arnold had "a close personal and professional relationship" with Nelson, who was president of a firm (Orion) that allegedly operated the Kissavos, the vessel involved in the arbitration.[13] The primary basis of the claimed close relationship was that Arnold and Nelson had "served together" on 19 arbitration panels and that in 12 of these, one of the arbitrators who selected Arnold was Nelson. Marc Rich furnished no other concrete support for its characterization of Arnold and Nelson as "close personal friends," and Nelson swore that his contact with Arnold was "limited to those instances where we happen to be members of the same panel and to occasions associated with our membership in the Society of the Maritime Arbitrators." Nelson also swore that neither Arnold nor his employer, National Bank of North America, had any business relationship with either Orion or

with Andros, the winning party in the arbitration, and that there was no social relationship between Arnold and Nelson; the two men had never so much as visited each other's homes. Nelson also pointed out that his contacts with Arnold were similar to those he had with Berg, the arbitrator appointed by Marc Rich, except that he had known Berg since 1957, while he had known Arnold only since 1973.

We believe that on this record Judge Brieant was justified in denying both discovery and an evidentiary hearing, and in refusing to vacate the award. From the papers presented, it can fairly be concluded that the relationship between Arnold and Nelson was a professional one, growing out of their service as arbitrators. There was no "business relationship" in the ordinary sense between them or between their employers. Whatever Orion's duties were with respect to the Kissavos, Orion had no direct financial stake in the outcome of the arbitration, and Nelson's interest was even more attenuated. Marc Rich argues that Arnold and Nelson had a relationship that should have been disclosed because allegedly "(a) most of Mr. Arnold's appointments as Chairman of arbitration panels (and the fees which resulted) were attributable to Mr. Nelson, and (b) Mr. Arnold consistently voted for Mr. Nelson's side in those disputes." But appellant's own affidavits recognized that when Arnold was appointed chairman of an arbitration panel that included Nelson, the third arbitrator, as well as Nelson, chose the chairman. And Andros points out that in all but one of those arbitrations, the award was unanimous. We simply do not regard this as the sort of information an arbitrator would reasonably regard as creating an impression of possible bias. It is worth noting that Marc Rich's own arbitrator, Jack Berg, did not think it important to disclose that he had known Nelson since 1957 and had sat with him on at least 15 panels, with Arnold on at least

13. For purposes of analysis, we put to one side whether this description of Orion's role was accurate. Andros claims that Orion's involvement was minor and ministerial.

10 panels, and with both Arnold and Nelson on at least three.[14]

Obviously, Arnold knew Nelson as a fellow arbitrator and perhaps in that capacity knew him well. But their service together on arbitration panels was no secret. Marc Rich based its claim of Arnold's inadequate disclosure upon "an exhaustive review of approximately 1200 published awards of the Society of Maritime Arbitrators," which it conducted after the award was handed down. It could have made such a review just as easily before or during the arbitration rather than after it lost its case. Indeed, it is not at all uncommon for parties to check the past decisions of arbitrators before an arbitration begins. Nor is it an adequate response that Marc Rich had no reason to scrutinize Arnold's prior service with Nelson because it had no way of knowing that Nelson had any "interest" in the proceeding. Whatever connection Orion had with the Kissavos was made clear from the documents submitted by Andros at the arbitration, and the name of its president was easily ascertainable. Finally, we note that Marc Rich was not at all concerned over Arnold's disclosures that he had been appointed as an arbitrator in the past by Andros, the opposing party in this arbitration, and that his employer "might have had [some business] dealings" with Andros. Nor was Marc Rich interested in Berg's disclosure that there may have been "business dealings" between his employer and Andros in the past. Judge Brieant obviously regarded Marc Rich's petition as a classic example of a losing party seizing upon "a pretext for invalidating the [arbitration] award." *Commonwealth Coatings,* supra, 393 U.S. at 151, 89 S.Ct. at 340 (White, *J.,* concurring). We believe that the judge properly denied discovery on this issue and was justified in refusing to explore it further.

■ In so deciding, we do not dispute the authorities maintaining that the discovery procedures of the Federal Rules of Civil Procedure are generally applicable to Title 9 proceedings. See 7 Moore's Federal Practice ¶ 81.05[7], at 81–82 (2d ed. 1975);[15] *Int'l Union of Electrical, Radio and Machine Workers v. Westinghouse Electric Corp.,* 48 F.R.D. 298 (S.D.N.Y.1969); see also Fed.R.Civ.P. 81(a)(3) (Federal Rules apply to proceedings under Title 9 "to the extent that matters of procedure are not provided for in those statutes"). But in the special context of what are in effect post hoc efforts to induce arbitrators to undermine the finality of their own awards, we agree with the district court that any questioning of arbitrators should be handled pursuant to judicial supervision and limited to situations where clear evidence of impropriety has been presented.

### III

Marc Rich also attacks the merits of the arbitration award. Observing that the charter party exonerates the charterer from liability for demurrage representing delays caused by deficiencies in the vessel, appellant alleges that such a deficiency was "indisputably" made out in the proceeding before the arbitrator, and concludes that the award "completely disregards both the expressed terms of the contract and the applicable law." Quoting the celebrated dictum that an arbitrator "does not sit to dispense his own brand of industrial justice," *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), appellant urges that the district court should have vacated the instant award under the authority granted by 9 U.S.C. § 10.

---

14. These statistics appear in appellee's brief and, we are told, were obtained by examining the published awards of the Society of Maritime Arbitrators.

15. Professor Moore summarizes the law on this point as follows:

When a Title 9 proceeding is brought, the discovery rules are applicable. It must be remembered, however, that [Fed.R.Civ.P.] 26 provides for discovery only of matters relevant to the subject matter of the controversy. In a Title 9 proceeding the question of whether an arbitrable contract exists is such a matter, and on this question discovery has been allowed. Discovery on the subject matter of the dispute to be arbitrated generally has been denied. (Footnotes omitted).

For present purposes, the actual holding of *Enterprise Wheel* and other language in the opinion are more instructive than the observation on which appellant relies. There as here, a vigorous assault had been mounted on the arbitrator's construction of a contract provision. The Court noted disapprovingly that

> [t]he Court of Appeals' opinion refusing to enforce the [contested] portions of the award was not based upon any finding that the arbitrator did not premise his award on his construction of the contract. It merely disagreed with the arbitrator's construction of it.

363 U.S. at 598, 80 S.Ct. at 1361. Justice Douglas's opinion concludes with a clear warning to all disappointed parties to arbitral proceedings who may be tempted to relitigate the merits in federal court:

> [T]he question of interpretation of the . . . agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

363 U.S. at 599, 80 S.Ct. at 1362.

This court has not been receptive—at least in recent years—to invitations to second-guess an arbitrator's resolution of a contract dispute. In *I/S Stavborg v. National Metal Converters, Inc.*, 500 F.2d 424 (2d Cir. 1974), we declined to disturb an award which we characterized as "based on a clearly erroneous interpretation of the contract," adding that "[w]hatever arbitrators' mistakes of law may be corrected, simple misinterpretations of contracts do not appear one of them." 500 F.2d at 432. See also *Local 771, I.A.T.S.E. v. RKO General, Inc.*, 546 F.2d 1107, 1113 (2d Cir. 1977);

*Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (Rakta)*, supra, 508 F.2d at 977; *Office of Supply, Government of Republic of Korea v. New York Navigation Co.*, 469 F.2d 377, 379 (2d Cir. 1972). We have consistently accorded the narrowest of readings to the Arbitration Act's authorization to vacate awards "[w]here the arbitrators exceeded their powers," 9 U.S.C. § 10(d), especially where that language has been invoked in the context of arbitrators' alleged failure to correctly decide a question which all concede to have been properly submitted in the first instance.[16]

■ The demurrage award that we are asked to overturn grew out of a controversy that fell within the broad arbitration clause of the charter party;[17] the arbitrators' authority to decide the question presented to them is not disputed. The award is supported by a majority opinion that takes cognizance of every argument made by appellant to this court and simply declines to reach the requested conclusion, on grounds that are hardly evanescent even if they do not command our heartfelt concurrence. Noting Marc Rich's contentions regarding the deficiencies of the ship, including alleged inadequacies of her pumps, the panel majority conceded that one of the charter party clauses "clearly excuses Charterer from having to pay demurrage for reason of vessel deficiencies." But the majority went on to emphasize the inherent ambiguity of the "vessel deficiencies" term. The charter party fails to set out any specific standard of performance to which the vessel is to be held; absent, say, a complete breakdown of the ship's pumps, the question of what level of equipment performance constitutes a "deficiency" is not clearcut.[18] Without overruling *I/S Stavborg v. National Metal Converters, Inc.*, supra, and

---

16. To the extent that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards and not 9 U.S.C. § 10 governs review in cases like that at hand, a question we find unnecessary to resolve, the scope for intervention is certainly no greater. See note 11 supra.

17. The relevant clause is reproduced at note 2 supra.

18. As even the dissenting member of the Arbitration panel recognized, Marc Rich's position on the merits was undermined somewhat by its willingness to charter the Kissavos subsequent to the events here relevant "under similar char-

doing obvious violence to analogous precedents of this circuit, we cannot review for error an arbitrator's resolution of such an issue.

 It seems that as long as even a glint of hope remains for judicial interference with the merits of an arbitration award, we must regretfully anticipate continued efforts to press contentions similar to that rejected here. The vague Arbitration Act standards for vacating awards do not foreclose these sallies altogether, and neither the Supreme Court nor our own precedents have completely slammed the door. Thus, the *I/S Stavborg* majority emphasized that the "clearly erroneous" interpretation it was upholding did not seem "irrational." 500 F.2d at 430 n.12 and 431. Cf. *Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 98 L.Ed. 168 (1953) (implying that federal courts may review for error awards rendered in "manifest disregard" of applicable law). And we acknowledged in *Sobel v. Hertz, Warner & Co.,* 469 F.2d 1211, 1214 (2d Cir. 1972) that "if the arbitrators simply ignore the applicable law, the literal application of a 'manifest disregard' standard should presumably compel vacation of the award." [19] But this much at least is certain: When arbitrators explain their conclusions (we reaffirmed in *Sobel* that they have no obligation to do so) in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result.

The judgment of the district court is affirmed.[20]

ter party provisions, once again, without a specific pumping guaranty."

**19.** We do not decide the still open question whether the "manifest disregard" ground for vacating an award is available in proceedings governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. See *Parsons & Whittemore Overseas Co. v.*

*Societe Generale de L'Industrie du Papier (Rakta),* supra, 508 F.2d at 977; and note 11 supra.

**20.** Appellee's petition for an award of double costs pursuant to F.R.A.P. 38 is denied. We cannot in good conscience characterize as "frivolous" an appeal that has provoked so extended an affirmance as the one just concluded.