**SUNOCO OVERSEAS, INC., Petitioner,**

**v.**

**TEXACO INTERNATIONAL TRADER, INC., Respondent.**

**No. 98 CIV. 8447(WCC).**

United States District Court,
S.D. New York.

Sept. 30, 1999.

As Amended *nunc pro tunc*
October 5, 1999.

Keane & Marlowe, East Brunswick, NJ, Christopher P. Keane, Mary Ann C. Marlowe, Of Counsel, for Petitioner.

Hill, Rivkins & Hayden, LLP, New York City, Douglas R. Burnett, Gerald W. White, Of Counsel, for Respondent.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

█ Petitioner Sunoco Overseas, Inc., ("Sun") brings this action to vacate the arbitration award rendered against Sun in favor of the respondent, Texaco International Trader, Inc. ("Texaco"). Sun seeks to vacate the Partial Final Award of the sole arbitrator dated May 12, 1997 and the Final Award of the sole arbitrator dated October 30, 1998, alleging that he violated the U.S. Arbitration Act, 9 U.S.C. § 10, due to his evident partiality and his manifest disregard of the law. Respondent Texaco submits a cross-motion to confirm the arbitration award in accordance with 9 U.S.C. § 9. We deny Sun's motion to vacate the arbitrator's award, and therefore grant Texaco's cross-motion to confirm the award.[1]

It has been established that "[W]here...arbitrators make an interim ruling that does not purport to resolve finally the issues submitted to them, judicial review is unavailable." *Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411, 414 (2d Cir.1980). Thus, in order for an arbitration award to be subject to judicial review, it must be final. *Eurolines Shipping Co. v. Metal Transp. Corp.*, 491 F.Supp. 590, 591–92 (S.D.N.Y.1980). Generally, in order for an award to be final, "the arbitrators must have decided not only the issue of liability of a party on the claim, but also the issue of damages." *Michaels*, 624 F.2d at 413–14 (inter-

---

1. Despite Texaco's argument to the contrary, we will assume, for purposes of this appeal, that Sun complied with the statute of limitations for the filing of this appeal. The Federal Arbitration Act, 9 U.S.C. § 12, allows a party ninety days to serve upon the adverse party notice of a motion to vacate the award. Texaco claims that the ninety-day period began running on May 12, 1997, when the issue of liability was decided, rather than on October 30, 1998, when the arbitrator's judgment as to damages was rendered, and thus Sun's petition, dated December 1, 1998, is untimely.

## BACKGROUND

Texaco and Sun entered into a sales contract on January 1, 1992 for a cargo of spray oil, Texaco agreeing to purchase 14,-900 barrels of spray oil from Sun, to be delivered in September of 1995. The two companies had participated in a number of similar agreements in the past, and the same standard contract was repeatedly used in dealings between the parties.[2] Sun confirmed that the oil would be available in late September 1995, and Texaco set out to charter a suitable vessel. The contract provided that Texaco was to elect a vessel for use in delivery of the spray oil, and permitted Sun forty-eight hours after such nomination to reject the vessel. Texaco then, through its affiliated chartering organization, went into the market to seek a suitable vessel. The vessel found was the M/T Proof Trader ("Proof Trader"). Upon nomination of the Proof Trader, Sun sent Texaco a questionnaire to ascertain information about the ship. Texaco filled out the questionnaire and timely returned it to Sun. Sun received the answers and, apparently finding the nominated ship acceptable, approved the use of the Proof Trader. After receiving Sun's approval, Texaco chartered the Proof Trader and dispatched it to Sun's terminal in Yabucoa, Puerto Rico to pick up the spray oil.

The Proof Trader arrived in Yabucoa on September 26, 1995. Upon inspecting the vessel, but after the forty-eight hour period for rejection had lapsed, Sun concluded that it could not safely load the spray oil onto the Proof Trader. Sun claimed that the vessel was not compatible with the facilities at Yabucoa due to location of the manifold on the ship, the rate at which the spray oil was to be loaded onto the ship, and the type of hoses used for lifting the oil. More specifically, Sun claimed that the spray oil could not be safely loaded onto the vessel because the manifold was too far aft. Further, Sun claimed that while spray oil is normally loaded at the Yabucoa port at a minimum rate of one thousand barrels per hour, the Proof Trader could only handle a maximum of five hundred barrels per hour. The location of the manifold, however, was clearly indicated in Texaco's responses to the questionnaire prepared by Sun. Nonetheless, Sun decided that the port and the vessel were incompatible, and Sun formally rejected the Proof Trader on September 29, 1995.

Following the rejection, a dispute arose between the two parties over who would bear the costs associated with the rejection of the Proof Trader. Under the terms of the contract, any dispute that arose under the contract was to be settled by an arbitrator to be agreed upon by both parties. Sun and Texaco agreed to use R. Glenn Bauer, an experienced maritime attorney who had adjudicated approximately fifty similar cases, as the sole arbitrator. Sun requested a bifurcated proceeding so that the issues of liability and damages would be argued and decided separately. The sole arbitrator granted this request.

The Partial Final Award, which decided the issue of liability, was rendered on May 12, 1997 in favor of Texaco. The Final Award, which determined the issue of damages, was issued on October 30, 1998. In the final award, Texaco was awarded $126,590.00 by the sole arbitrator. This amount included $126,385.00 for the payment to the owners of the Proof Trader to cancel the charter, and $205.00 for the vessel's inspection fees.

## DISCUSSION

I. *Partiality of the Sole Arbitrator*

 Sun moves, pursuant to 9 U.S.C. § 10, to vacate the arbitration award based upon the evident partiality of the sole arbitrator. While evident partiality or corruption by the arbitrator is a valid ground for vacating an arbitration award, there is a

---

nal citations omitted). Therefore, we will assume that Sun's December petition, filed within ninety days of the arbitrator's Final Award, was timely.

**2.** It is for this reason that the contract is dated three years prior to the delivery date.

high standard in order to prevail on such a claim. 9 U.S.C. § 10(a)(2). "Courts are reluctant to set aside an award based on a claim of evident partiality, and will do so only if bias of the arbitrator is direct and definite; mere speculation is not enough." *Sofia Shipping Co., Ltd. v. Amoco Transp. Co.*, 628 F.Supp. 116, 119 (S.D.N.Y.1986). In claiming partiality, Sun asserts that there was an ex parte communication between the sole arbitrator and Texaco. More specifically, Sun alleges that in a phone conversation between employees for Sun and Texaco that occurred prior to the arbitrator's October 30, 1998 decision as to damages, a Texaco employee, John Kretlow, indicated that he knew the approximate amount the arbitrator planned to award, and this demonstrates that an ex parte communication had occurred. Because this allegation amounts to "mere speculation" without any showing of prejudice, we reject Sun's claim. *Id.*

First, we note that Sun has come forward with no direct evidence that any ex parte communication occurred. Affidavits from both of Texaco's attorneys as well as the sole arbitrator strongly deny that any such ex parte communication took place. Bauer Affidavit ¶ 2; Phillips Affidavit ¶ 2; Silberstein Affidavit ¶ 2. In fact, the affidavit of John Kretlow, a new Texaco employee responsible for tracking Texaco's outstanding bills, makes clear that he simply made a mistake, and, not realizing that the hearing was bifurcated, thought the amount of damages had been determined, when in fact only liability had been decided at that time. Kretlow Affidavit ¶ 2. As a result, he simply called to find out when the money might be paid. *Id.* This phone call, from a confused Texaco employee to a Sun employee, forms the entire basis of Sun's claim that counsel for Texaco had engaged in an unethical, ex parte communication with the arbitrator. It is a speculative argument based upon mere conjecture, and we will not vacate the arbitrator's decision based upon such meager evidence.

Moreover, even were we to accept Sun's allegations as true, Sun's allegation is simply that Texaco was notified before Sun as to the approximate amount of the award. Thus, even if Sun's vague assertions were proven, the purported ex parte communication most likely resulted in no prejudice to Sun whatsoever. Despite Sun's argument to the contrary, we will not vacate a lengthy and costly arbitration process simply based on the "appearance of impropriety," *see* Sun's Memorandum of Law at 5, as such a low threshold would subvert the well established tradition of according arbitration decisions substantial deference. Sun's request that we adopt such a low standard ignores binding Second Circuit precedent directly on point. *See Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 83–84 (2d Cir.1984) (". . . .we read Section 10(b) as requiring a showing of something more than the mere 'appearance of bias' to vacate an arbitration award").

■ Sun has also alleged that the sole arbitrator's former law firm may have had some dealings with a company named Stena Bulk, Stena Bulk and Texaco participated in a joint venture company called StenTex, and this connection, alleges Sun, is sufficient to establish evident partiality on the part of the sole arbitrator. Sun, however, again fails to meet the high burden for proving such a claim.

The sole arbitrator retired from his former law firm in 1994, and StenTex was not even incorporated until 1995. Bauer Affidavit ¶ ¶ 1, 8. Further, the arbitrator submitted a sworn statement to this Court attesting that he never worked on any Stena Bulk matters. *Id.* at ¶ 7. The mere fact that the sole arbitrator's former law firm represents a company that participated in a joint venture with Texaco does not establish evident partiality. Maritime law is a specialized field, and if arbitrators could be disqualified simply because their former law firm did work for a company that participated in a joint venture with one of the parties, even if that arbitrator did not work on the matter in any way,

there would be no experienced arbitrators from whom to choose. *Morelite*, 748 F.2d at 83 ("For to disqualify any arbitrator who had professional dealings with one of the parties.... would make it impossible, in some circumstances, to find a qualified arbitrator at all"). The attenuated connection between the arbitrator, his former law firm, and Texaco, falls far short of "compelling" us "to conclude that [the] arbitrator was partial to one party to the arbitration." *Id.* at 84.

## II. *Manifest Disregard of the Law*

### A. *Introduction*

■ In addition to Sun's claim that the arbitrator acted with evident partiality, the company also claims that he acted with manifest disregard for the law. *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 821 (2d. Cir.1997). This standard is a difficult one to reach, as this "clearly means more than error or misunderstanding with respect to the law." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d. Cir.1986) (internal citations omitted). "Moreover, the term 'disregard' implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it. To adopt a less strict standard of judicial review would be to undermine our well established deference to arbitration as a favored method of settling disputes when agreed to by the parties." *Id.* In fact, "When arbitrators explain their conclusions...in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result." *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 704 (2d Cir.1978).

Sun admits that the relevant agreement entered into by the parties provided that Texaco was to nominate a ship suitable for shipping spray oil, after which time Sun had forty-eight hours to reject the selected vessel. *See* Agreement for the Sale and Purchase of Spray Oil ("Agreement") at Clauses 5, 8. Sun also concedes that the Agreement provided that if Sun did not reject the vessel within forty-eight hours, the company would be deemed to have accepted it. *Id.* at Clause 8. Sun further admits that it did not reject the nominated vessel within forty-eight hours of its selection, that Texaco timely delivered the vessel to the docks and only then did Sun, after forty-eight hours had lapsed, reject the vessel. *See* Sun's Memorandum of Law at 1–2. Thus, Sun's entire defense for its arguably tardy rejection of the Proof Trader resides in a single phrase in Clause 5 of the agreement, which requires rejection within forty-eight hours "or as otherwise set forth or agreed" by the parties. Sun argues that other provisions in the contract, while making no reference to Clause 5 whatsoever, impliedly overrule the forty-eight hour limitation, and thus Sun's rejection was timely. After analyzing the various provisions that Sun argues impliedly augment Clause 5, we rule that there was clearly "colorable justification" for the arbitrator to reject Sun's claims. *Andros Compania Maritima, S.A.*, 579 F.2d at 704.

### B. *Clause 8*

■ Clause 8 requires Texaco, after selecting a suitable vessel, to advise Sun of the "name and details" of the ship, and gives Sun forty-eight hours after receipt of such information to reject the nominated vessel. Sun's primary basis for arguing that the arbitrator acted with manifest disregard of the law revolves around the word "details" in Clause 8. Sun argues that while Texaco forwarded various information to Sun in response to Sun's questionnaire, the information provided by Texaco was incomplete. More specifically, Sun argues that while it was clear from Texaco's answers that the manifold was located further in the rear of the vessel than the manifolds on prior vessels nominated by Texaco, it was not clear that the vessel had a flared bow and stern or that the vessel's hoses were not certified by the United

States Coast Guard. Sun argues that while the manifold placement alone did not make the vessel unsuitable for loading, the manifold placement coupled with the hose problem and the hull configuration made loading unsafe.[3]

We hold that there was clearly a "colorable justification" for the arbitrator's ruling that Texaco provided Sun with sufficient "details" regarding the vessel. *Andros Compania Maritima, S.A.*, 579 F.2d at 704. The word "details" is nowhere defined in the contract drafted by Sun itself, and we are therefore mystified as to how Sun can ask us to rule that the arbitrator's interpretation of the term was in manifest disregard of the law.

All evidence submitted to this Court indicates a strong basis for the arbitrator's decision. First, the questionnaire submitted by Sun was a standard questionnaire, commonly used in the industry. *See* Sun's Memorandum of Law at 13. Second, Sun itself chose the questionnaire that was sent to Texaco. *Id.* Third, Sun neither inquired about any ambiguous answers Texaco might have given, nor did Sun request additional information. *Id.* Finally, and most importantly, Mr. Doran, a Sun employee who was the terminal's marine manager at the Yabucoa port, stated that he would have rejected the Proof Trader based on the information provided in the questionnaire alone. *See* August 14, 1996 Arbitration Hearing Testimony of Glen A. Gould at 49–50.[4] Moreover, we note, as did the arbitrator, that in rejecting the vessel in 1995, Sun referred only to the manifold placement as the reason for its rejection, and even Sun concedes that the manifold location was clearly indicated in

Texaco's answer to the questionnaire. *See* September 29, 1995 Letter from Sun to Texaco Rejecting Proof Trader ("The location of the ship's manifold does not permit the vessel to align itself with the loading arm on the dock without inflicting damage to the dock and the vessel"). Thus, if the Sun employee in charge of the port testified that he would have rejected the ship based upon information provided by Texaco in its questionnaire answers, and the only reason given for rejection by Sun in 1995 was based upon information that was clearly indicated in the answers (namely the location of the manifold), then we cannot rule that the arbitrator's decision that Texaco had provided sufficient "details" to Sun about the ship was manifest error.

Simply put, these highly experienced corporations, who had engaged in similar transactions for years, drafted an incomplete contract. There is no indication in the Agreement as to what kind of "details" Texaco was required to provide. Thus, this Court cannot determine whether the requirement that Texaco provide "details" about the ship meant that they were required to describe such information as the configuration of the bow and stern, as well as information about the cargo hoses on board. Therefore, we cannot rule that the arbitrator's decision on this issue was in manifest disregard of the law or the terms of the Agreement.

### C. *Clause 9*

■ Clause 9 states:

The vessel shall comply with all applicable governmental and Seller's regulations in force at loading port including

---

**3.** For example, Sun claims that the flared bow and stern made it impossible for the vessel to move close enough to the wharf to load the oil safely into the rear-oriented manifold.

**4.** Despite Sun's argument to the contrary, this fact is highly relevant. Sun has alleged that Texaco provided incomplete "details" related to the Proof Trader, but Sun admits that the location of the manifold was plainly identified in Texaco's responses to the questionnaire. If

the Sun manager at the Puerto Rico site said that he would have rejected the boat based upon the contents of the questionnaire answers alone, then this severely undercuts Sun's argument that Texaco's "incomplete" answers compelled Sun's tardy rejection of the ship. This is true whether the ultimate decision related to accepting the nominated vessel was made by Mr. Doran, or, as Sun argues, by the Manager of Quality Assurance, Mr. Murphy. *See* Sun's Memorandum of Law at 14.

those relative to safety. If, in the opinion of Seller the Vessel is not equipped so that it can be safely moored, loaded and unmoored, the Vessel shall not be loaded. Seller shall have the right to shift or require Buyer to shift the Vessel at port of loading from one berth to another or to anchorage. Seller shall pay all expenses incurred in shifting the Vessel, unless shifting of the vessel is required due to.... unsuitability of Vessel's physical facilities.... in which case Buyer shall pay such expense.

Sun argues that although Clause 9 makes no reference to Clause 5, Clause 9 impliedly overrules the forty-eight-hour time limit for rejection contained in Clause 5 if the basis for rejection is "safety." Thus, Sun claims that Clause 9 allows it to reject the ship at the port, even after Texaco had contracted with a third-party to deliver the boat to the dock. In this way, Sun claims that only after the boat appeared at the dock did they realize that it was unsuited for safe loading of the spray oil, and thus Clause 9 permitted them to reject the vessel at the port. We cannot say, however, that the arbitrator's rejection of this argument was in manifest disregard of the law or the Agreement.

First, this interpretation seems to defy the plain language of the Agreement. While Clause 9 requires the buyer, Texaco, to bear some financial responsibility if the vessel cannot be "safely moored, loaded, and unmoored," this pecuniary responsibility explicitly relates to the cost of "shift[ing] the Vessel at port of loading from one berth to another or to anchorage." *See* Agreement at Clause 9. Clause 9 has absolutely nothing to do with Sun's right to reject the vessel outright, or Sun's right to require Texaco to provide an alternative vessel. Clause 9 also makes no

reference to overruling the forty-eight-hour time limit for rejecting the vessel. By its own terms, Clause 9 relates only to the cost of moving the nominated vessel to another berth. Sun requests that the Agreement be read so that although Clause 5 and 8 explicitly require Sun to reject the vessel within forty-eight hours of its nomination, if Sun determines that the boat is unsafe, it can reject the boat after the forty-eight hour period has lapsed. There is insufficient basis for this reading in the Agreement to support a ruling that the arbitrator's ruling was in manifest disregard of the law.[5]

### D. *Clause 10*

■ Clause 10 states in relevant part:

10. Warranties and Limitations of Liability.

(a) Seller warrants that the products sold to buyer under this Agreement shall meet seller's specifications for the product at the time of delivery. These warranties are in lieu of all other warranties, express or implied, including but not limited to, fitness for a particular purpose and merchantability.

(b) The correction of the nonconformity, the refund of the price or the replacement of the product, at seller's option, constitutes fulfillment of all liabilities or [sic] seller and remedies of buyer whether the liabilities and remedies are based on contract, negligence or otherwise. Neither party will be liable for special, consequential or incidental damages.

(c) Claims. Any claims as to defects in quality or shortage in quantity must be made in writing within 180 days from the bill of lading date....

---

5. In rejecting Sun's interpretation, we have accepted Sun's assertions as true, and assumed that it rejected the Proof Trader because of safety concerns. In fact, we note that the arbitrator, who heard extensive presentation of evidence on this issue, determined that the basis for Sun's rejection actually had nothing to do with safety. He ruled

that Sun's reason for rejecting the vessel "was not safety...[but] pure incompatibility. The shore manifold didn't fit the ship, and the shore pumps didn't fit the ship." *See* Partial Final Award at 1765. It is by no means clear that this incompatibility made the loading operation unsafe.

While the entirety of Clause 10 discusses warranties and liability related to "products sold," *see* Agreement at Clause 10(a), Sun asks this Court to a read a single sentence from Clause 10(b) in complete isolation from the rest of the Agreement. In this way, Sun contends that the sentence, "Neither party will be liable for special, consequential or incidental damages," must be read to relate to damages of any kind, and therefore means that Sun is not liable for Texaco's payment to a third-party for the chartering of the Proof Trader. *See* Agreement at Clause 10(b). We hold that the arbitrator's rejection of this interpretation was not in manifest disregard of the law and, indeed, was quite correct.

Sun's de-contextualized reading of this single sentence simply disregards basic tenets of contract construction, which compel the reader to interpret contract language based upon the setting in which that language appears:

> It is a universal rule that a contract must be construed as a whole and that the intention of the parties is to be ascertained from the entire instrument. A contract being construed is to be considered as a whole and the meaning gathered from the entire context, and not from particular words, phrases, or clauses, or from detached or isolated portions of the contract. All the words in a contract are to be considered in determining its meaning, and the entire contract in all of its parts should be read and treated together. This is so because each portion of a contract is qualified by other portions which are relevant thereto, and has no separate existence apart from them.

17A Am.Jur.2d Contracts § 386 (1991). Here, the sentence immediately proceeding the language in question has to do with "the price of the replacement of the product." *See Agreement* at Clause 10(b). Similarly, the sentence appearing immediately after the language in question discusses "defects in quality or shortage in quantity" of the product. *Id.* at Clause 10(c). Sun asks us to take the phrase related to consequential damages completely out of context and to rule that this language applies to consequential damages of any kind. Moreover, we would have to rule that this interpretation is so clear based upon applicable law and the plain language of the Agreement that the arbitrator's decision did not even offer a "barely colorable justification for the outcome reached." *Andros Compania Maritima, S.A.,* 579 F.2d at 704. We decline to do so.[6]

---

6. We also note that, we have given Sun the benefit of the doubt, and assumed that the cost of leasing the vessel was a special, consequential or incidental damage. Of course, if these costs are direct damages, then Sun's entire argument would be rendered moot.

Moreover, while Sun extensively briefed the issue of whether this damage limitation applied to consequential damage of any kind, each of the cases it relies on are inapposite. For example, while *Mom's Bagels v. Sig Greenebaum, Inc.,* 164 A.D.2d 820, 559 N.Y.S.2d 883 (N.Y.App.Div.1990) involves a contract limiting liability for consequential damages "arising from break-downs or defectiveness," in that case, the plaintiff was specifically seeking damages for a defective product, and thus the language limiting liability clearly applied. Similarly, if the case before us involved consequential damages because of defective spray oil, then the provision would clearly apply as well. Further, while *Matco Elec. Co., Inc. v. American Dist. Telegraph Co.,* 156 A.D.2d 840, 549 N.Y.S.2d 843 (N.Y.App. Div.1989) and *Mayor v. Jean Philippe Fragrances, Inc.,* No. 92 Civ. 6217, 1994 WL 9684 (S.D.N.Y. Jan.10, 1994), involve cases where the consequential damage limitation was applied to areas other than product defects, in both cases, the contact contained language that was clearly intended to apply to situations beyond the limited area of product warranties. *See Matco,* 156 A.D.2d at 843, 549 N.Y.S.2d 843 ("[Defendant] shall in no event be liable for any consequential or incidental damages *of any nature,* including *without limitation,* damages for or personal injury or damages to property...." (emphasis added)); *Mayor,* 1994 WL 9684, *5 ("Under no circumstances shall [defendant] be liable to you or any customer of yours for any special or consequential damages *of any sort including without limitation* personal injury or property damage arising out of the use of the products") (emphasis added).

## CONCLUSION

For the reasons stated above, Sun's motion to vacate the arbitration award is denied and Texaco's cross-motion to confirm the arbitration award is granted. Texaco's motion for an award of costs and reasonable attorney's fees is denied.

SO ORDERED.