**In the Matter of the Arbitration between SANKO S.S. CO., LTD., Appellant, and COOK INDUSTRIES, INC., Appellee. No. 6, Docket 73–1355.**

United States Court of Appeals, Second Circuit.

Argued Sept. 12, 1973.

Decided Oct. 17, 1973.

---

ant to the rules of the Society of Maritime Arbitrators, seeks a rehearing of a charter dispute by an impartial panel of arbitrators. It claims that the presiding member of the three-man panel which originally arbitrated its dispute with Cook Industries failed to disclose his company's previous associations with Francis O'Brien, Cook's attorney at the arbitration hearing, and large-scale dealings between Cook and the presiding arbitrator's ultimate employer, the Louis Dreyfus partnership. After an award by the panel dated June 19, 1972, finding that Sanko had breached the charter contract and that Cook was thus excused from performance, Sanko sought an order in the New York Supreme Court vacating the award. Cook did not respond, but instead moved on September 27, 1972 in the United States District Court for the Southern District of New York to have the award confirmed. Shortly thereafter Sanko moved to vacate in the same district court.[1] By a memorandum decision dated December 8, 1972, Judge Brieant denied Sanko's motion to vacate and granted Cook's motion to confirm, without an evidentiary hearing. An order was entered accordingly on January 15, 1973, from which Sanko appeals.

John P. Meade, New York City (Meade, Wasserman & Freeman, New York City, on the brief), for appellant.

Francis J. O'Brien, New York City (Hill, Rivkins, McGowan & Carey and Frederick W. Meeker, New York City, on the brief), for appellee.

Before LUMBARD, FRIENDLY and FEINBERG, Circuit Judges.

LUMBARD, Circuit Judge:

Appellant, Sanko Steamship Co., Ltd., the unsuccessful party in an arbitration conducted under a New York Produce Exchange Arbitration Clause and pursu-

The dispute between Sanko and Cook has its origins in a charter contract entered into by the parties on February 26, 1971. This contract was a grain charter on a New York Produce Exchange form for one voyage from any port in the United States Gulf Coast range to Japan by ship to be supplied by Sanko, a Japanese company, to Cook, an American grain dealer. Under the terms of the charter, the vessel was to load sometime between August 1 and August 25, 1971. Sanko was required to give ten days notice of the vessel's estimated time of readiness. Cook was then

---

1. Vacation of the award was sought under 9 U.S.C. § 10, which provides that

the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(a) Where the award was procured by corruption, fraud, or undue means.

(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

. . . .

to provide Sanko or its agent with a declaration of the port in the Gulf Coast range where the vessel was to load "at least 96 hours prior [to] the vessel's estimated time of readiness." If the ship was not ready to load before noon on August 25, Cook was to have the option of canceling the charter.

On July 15 and August 6, Sanko gave Cook an estimated time of readiness of August 18 for one of its ships, the "Mary S." Sanko's office in New York and its agent then sought an official declaration of the loading port from Cook, but without success. Finally, Cook telexed Sanko's Tokyo office on August 23 declaring New Orleans the loading port. Although the Mary S was still discharging cargo in Houston at that time, she was able to reach New Orleans and tender her notice of readiness by 10:45 a. m. on August 26, only 76 hours after the loadport nomination by Cook. The vessel was nevertheless rejected because it had arrived after the cancellation date of August 25.

Sanko claimed a loss in excess of $200,000 due to this cancellation and sought arbitration under the terms of the contract. An arbitration panel was chosen, consisting of one member appointed by Sanko and one by Cook, with these two arbitrators then selecting John Besman, a founder of the Society of Maritime Arbitrators, as chairman of the panel. After hearing the evidence and reviewing the charter contract, the arbitration panel unanimously rejected Sanko's claim, concluding that although Cook had been late in making its loadport nomination, it was excused from performance because the Mary S could not have arrived in New Orleans under any circumstances before the cancellation date of August 25.

In seeking to have the arbitration panel's award vacated, Sanko raised in the New York Supreme Court and then in the district court the issue of Besman's failure to make full disclosure of his business connections with Cook Industries and its counsel, Francis O'Brien. At the commencement of the arbitration proceedings, Besman had stated that the company of which he was president, Sagus Marine Corporation, had had business dealings with Cook "of a spot nature." But according to Sanko, he failed to reveal several other significant connections with Cook. Sanko claimed that inquiries it had made as a result of its dissatisfaction with the arbitration award had revealed that Sagus Marine is a subsidiary or affiliate of the Louis Dreyfus Partnership of France and that shortly after the arbitration award Besman had left for Europe to head a second Dreyfus subsidiary. Dreyfus, whose man Besman clearly was, is, like Cook, one of the few major world grain dealers. But although technically competitors, the two companies, according to Sanko, arrange "swaps" and "sales" from time to time running into the millions of dollars. Thus, Besman might have had some interest in reaching a decision favorable to Cook, if only to lay the groundwork for a return favor to Dreyfus from Cook in the future.

Sanko also claimed discovery of ties between Besman and Cook's attorney, Francis O'Brien. It maintained that Sagus Marine had been represented by O'Brien for some time and, in fact, that it had followed him when he had shifted law firms in order to assure his continued representation as its counsel.

Although stating that he would accept Sanko's version of contested facts and that no evidentiary hearing would therefore be necessary, Judge Brieant nevertheless discounted these instances of undisclosed interests. He failed to find any parent-subsidiary relationship between Dreyfus and Sagus Marine, although this had been strongly urged by Sanko. With regard to transactions between Cook and Dreyfus, he found an "occasional business relationship" which was "insubstantial," a conclusion at variance with Sanko's position, stated in its affidavit, that there were "continuing business dealings" between the companies. Concerning the relationship between Besman and Cook's attorney,

O'Brien, the court seemed to interpret the facts to show merely that O'Brien "formerly belonged to a law firm which formerly represented [Besman's] employer in an unrelated matter." In contrast, Sanko had pointed to a far more substantial and continuing relationship.

■ These discrepancies require that this case be remanded so that an evidentiary hearing may be held and the full extent and nature of the relationships at issue may be ascertained. After the facts of the relationship between Cook and Dreyfus or Besman and O'Brien are thoroughly aired, the district court will be in a better position to follow the dictates of Commonwealth Coatings v. Continental Cas. Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968).

*Commonwealth Coatings* involved an arbitration between a subcontractor and sureties on the prime contractor's bond. In a procedure similar to that followed by Sanko and Cook, the subcontractor and the prime contractor each appointed an arbitrator and these two arbitrators then selected a third arbitrator. This third arbitrator had had "repeated" and "significant" business dealings with the prime contractor "involving fees of about $12,000 over a period of four or five years," although there had been no contacts during the year preceding the arbitration. The business relationship that had existed was not revealed to the subcontractor and for this reason it sought to have the arbitration award in favor of the sureties set aside.

The Court held that the award must be vacated, declaring that arbitrators are required to disclose "any dealings that might create an impression of possible bias." 393 U.S. at 149, 89 S.Ct. at 339. Comparing the arbitrator to a judge, the Court emphasized that while [i]t is true that arbitrators cannot sever all their ties with the business world . . . we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review.

Mr. Justice White, with Mr. Justice Marshall's concurrence, joined the opinion of the Court, but added some further comments. Although not endorsing the view that arbitrators should be held to as high standards as judges and therefore be required to disqualify themselves in all instances in which a judge would have been required to do so, Mr. Justice White did endorse the Court's position that extensive disclosure must be made by each arbitrator prior to the arbitration:

[I]t is enough for present purposes to hold, as the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed. 393 U.S. at 151–152, 89 S.Ct. at 340.

Accordingly, Justices White and Marshall also concluded that the arbitrator's business dealings should have been disclosed.

■■ To be sure, the broad disclosure called for in *Commonwealth Coatings* does not require that an arbitrator "provide the parties with his complete and unexpurgated business biography." 393 U.S. at 151, 89 S.Ct. at 340; Reed & Martin, Inc. v. Westinghouse Elec. Corp., 439 F.2d 1268 (2d Cir. 1971). But where dealings "might create an impression of possible bias," they must be disclosed.[2] Indeed, it seems to us that

---

2. Section 11 of the Maritime Arbitration Rules of the Society of Maritime Arbitrators appears to endorse a similar standard of disclosure. The rule provides that

At the time of receiving his notice of appointment, a prospective Arbitrator is required to disclose any circumstance tending to raise a presumption of bias or which he believes might disqualify him as an impartial Arbitrator. Upon receipt of such information, the Secretary shall immediately disclose it to the parties, who, if willing to proceed under the circumstances disclosed, shall, in writing, so advise the Secretary. If either party declines to waive a presumptive disqualification, the

the better practice is that arbitrators should disclose fully all their relationships with the parties, whether these ties be of a direct or indirect nature.[3] Although some unnecessary disclosure may result,

> if arbitrators err on the side of disclosure, . . . it will not be difficult for courts to identify those undisclosed relationships which are too insubstantial to warrant vacating an award. Commonwealth Coatings v. Continental Cas. Co., 393 U.S. at 152, 89 S.Ct. at 341 (White, J., concurring).

Moreover, the role of the judiciary in determining an arbitrator's impartiality after an award has been made will be significantly reduced, since the parties will have the opportunity at the outset of the arbitration to reject an arbitrator or accept him with full knowledge of his connections with the other party.[4] The task of judging impartiality will thus wisely be "consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business." Commonwealth Coatings v. Continental Cas. Co., 393 U.S. at 151, 89 S.Ct. at 340.

The appellee contends, however, that two recent decisions of this court, Garfield & Co. v. Wiest, 432 F.2d 849 (2d Cir. 1970), cert. denied, 401 U.S. 940, 91 S.Ct. 939, 28 L.Ed.2d 220 (1971), and Cook Industries v. C. Itoh & Co., 449 F.2d 106 (2d Cir.), cert. denied, 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1971), support its view that *Commonwealth Coatings* is inapplicable to the present case. We disagree. Garfield & Co. v. Wiest involved the failure of an arbitrator to disclose his dealings with one of the parties to an arbitration between two member firms of the New York Stock Exchange. The court concluded that *Commonwealth Coatings* did not apply because Garfield had waived any objections when it joined the Stock Exchange. At that time it had been required to agree to arbitration of disputes with another member firm by a panel comprised of other members of the Exchange. The court reasoned that the company should have known that any ar-

---

vacancy thus created shall be filled in accordance with the applicable provisions of these Rules.

Commenting on a very similar provision in the Rules of the American Arbitration Association, section 18, the Court in *Commonwealth Coatings* stated that

This rule of arbitration . . . rest[s] on the premise that any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias.

3. Whether ties are so indirect or remote that they could not reasonably create an impression of bias is a question that must be answered by reference to the facts of the particular case. If the relationship between Besman and Cook Industries through the Dreyfus partnership is as substantial as Sanko alleges on the basis of its present information, even though that relationship is not as direct as the dealings between the prime contractor and one of the arbitrators in *Commonwealth Coatings* and is of a different nature, the district court might still find that it could have raised doubts concerning Besman's impartiality and should have been revealed.

4. In certain disputes this will not be possible since the particular rules governing the arbitration may leave the determination of the question of disqualification to the arbitration panel. In such cases, a refusal by the panel to compel an allegedly partial arbitrator to step down will generally be reviewable by a district court only after an award has been made. Catz Am. Co. v. Pearl Grange Fruit Exch., 292 F.Supp. 549, 551 (S.D.N.Y.1968); Petition of Dover S.S. Co., 143 F.Supp. 738, 742 (S.D.N.Y.1956); San Carlo Opera Co. v. Conley, 72 F.Supp. 825, 833 (S.D.N.Y.1946), aff'd, 163 F.2d 310 (2d Cir. 1947). *But see* Erving v. Virginia Squires Basketball Club, 468 F.2d 1064, 1067 (2d Cir. 1982). However, in most cases, the parties themselves will be able to compel the disqualification of arbitrators suspected of bias prior to the commencement of the proceedings. For example, under § 11 of the Maritime Arbitration Rules of the Society of Maritime Arbitrators, as under § 18 of the Rules of the American Arbitration Association, a party may have an arbitrator replaced simply by failing to waive a presumptive objection that arises if any circumstances are disclosed by the arbitrator prior to the hearing which tend to suggest bias.

bitrators coming from among the other Exchange members would very probably have had dealings in the ordinary course of business with the other party to the arbitration.[5] A similar result was reached in Cook Industries v. C. Itoh & Co., *supra*. That case involved arbitration of a dispute over a contract to purchase corn between Cook Industries, the same company as in the present case, and C. Itoh & Co., another grain dealer. After an award in favor of C. Itoh & Co., Cook sought to have it vacated on the ground that one of the arbitrators was an employee of a third corn trading firm, which had had substantial dealings with C. Itoh. The court rejected this claim, noting that there were only a limited number of corn traders, that they often dealt with each other, and being a trader itself, Cook must have known of these dealings.

Unlike the *Garfield* and *Cook* cases, the record in the present case, as it now stands, does not justify a holding that Sanko knew or should reasonably have known, of the undisclosed dealings. *See* Cook Industries v. C. Itoh & Co., supra at 108. Sanko and Cook were not members of a single closely-knit trading group. Moreover, Sanko had a very limited presence in the United States. Only two of its officers resided here. Furthermore, Sanko's officers and its agents have denied in affidavits any knowledge of or discussions concerning contacts Besman might have had with Cook or its attorney. Although we conclude that there is no basis in the present record for the reliance placed by the appellee on our decisions in *Garfield* and *Cook,* the district court, on remand, should, of course, give full consideration to any further evidence which supports Cook's argument that Sanko did, in fact, know or have reason to know of Besman's undisclosed business relationships.

Reversed and remanded.

5. The court emphasized, however, that its holding did not extend to dealings between the other party to the arbitration and the arbitrator which were not in the ordinary course of Exchange business and of which Garfield therefore could not have been presumed to be aware.