In the Matter of the Arbitration between INTERNATIONAL PRODUCE, INC., Petitioner and Cross-Respondent,

and

A/S ROSSHAVET, Owners of the S. S. ROSS ISLE, Respondent and Cross-Petitioner.

No. 79 Civ. 3920 (VLB).

United States District Court, S. D. New York.

April 16, 1980.

Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, for petitioner and cross-respondent.

Haight, Gardner, Poor & Havens, New York City, for respondent and cross-petitioner.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I.

This case is before me on a petition to vacate a maritime arbitration award and a cross-petition to confirm.

The only issue raised concerns the propriety of an arbitrator's refusal to disqualify himself when he acquires an active interest as a businessman in another arbitration in which

a) his side is represented by counsel to one of the parties in the arbitration before him;

b) the opposing side is represented by counsel to the other party in the arbitration before him; and

c) the arbitrator is expected to testify as a witness and be examined and cross-examined by the law firms who represent the parties in the arbitration before him.

For the reasons which follow the petition to vacate is granted and the petition to confirm is denied.

### II.

This action arises out of a charter party between petitioner International Produce, Inc. ("charterer") and A/S Rosshavet ("owner") for the hire of the S.S. Ross Isle. When a dispute arose between the parties, they submitted it to arbitration as provided by the agreement. Pursuant to the Rules of the Society of Maritime Arbitrators, the charterer chose one arbitrator, the owner chose another, and the two arbitrators then chose a third, Mr. Hammond L. Cederholm, the controversial figure in this action. Mr. Cederholm is, and was at the time of his selection, a vice president of James W. Elwell & Co., Inc. ("Elwell"), a firm which renders management services for the owners of commercial vessels.

The first hearing was held on September 8, 1977 at which time counsel for both parties made opening arguments. The owner was represented by the law firm of Haight, Gardner, Poor & Havens ("Haight Gardner") and Hill, Rivkins, Carey, Loesberg & O'Brien ("Hill Rivkins") represented the charterer. No witnesses were called. Mr. Cederholm at that time disclosed that Haight Gardner was "handling one P&I * case of ours."

At the time he made his disclosure, Mr. Cederholm invited further inquiry by Mr. Carey of Hill Rivkins, counsel to the charterer. Mr. Carey declined the invitation and stated that the panel was acceptable to the charterer. Had Mr. Carey inquired further, he would have learned that a vessel called the "Mary S", managed by the Elwell firm, was involved in the "P&I case" to which Mr. Cederholm referred.

On December 6, a second hearing was held. The arbitrator chosen by the owner had become ill and was unable to attend. Because the owner's two scheduled witnesses had travelled from Norway and Louisiana to give testimony, the parties agreed to proceed with the hearing, on the understanding that the missing arbitrator would read the transcript. At the hearing the master and the pilot of the Ross Isle testified on behalf of the owner.

Two days later, on December 8, another incident occurred involving the Mary S. Mr. Cederholm on behalf of the Elwell firm was personally involved in the negotiations and activities of December 8 and 9 which led to a dispute between the owner of the Mary S and its charterer. The charterer retained Hill Rivkins to represent them in taking that claim to arbitration. The owner's P&I club retained Haight Gardner. Although neither of the individual attorneys representing the parties to the Mary S arbitration, Francis O'Brien of Hill Rivkins and Thomas Howarth of Haight Gardner, was involved in the Ross Isle arbitration, one Haight Gardner associate, Howard Miller,

---

* Protection and indemnity a reference to an insurance arrangement through a Protection and Indemnity Club very common in the maritime industry.

worked on both arbitrations. From the outset, there appeared to be a substantial likelihood that Mr. Cederholm would be called as a witness in the Mary S case by Haight Gardner and would be cross-examined by Hill Rivkins.

Several days after Hill Rivkins was retained in connection with the Mary S arbitration, the circumstances came to Mr. Carey's attention. Shortly thereafter, in early January of 1978, he requested by telephone that Mr. Cederholm withdraw from the Ross Isle arbitration on the grounds that the roles to be played by Haight Gardner, Hill Rivkins and Mr. Cederholm in the upcoming Mary S arbitration would give rise to a presumption of bias on the part of Mr. Cederholm. Mr. Cederholm stated that he had been planning to make full disclosure at the next hearing and that he would take the matter under advisement while soliciting the views of opposing counsel and the other arbitrators.

Those views were solicited, and supported Mr. Cederholm's continuation on the Ross Isle panel. Mr. Cederholm informed Mr. Carey, by letter dated January 13, that he declined to disqualify himself. He premised that decision on the condition that Howard Miller of Haight Gardner, who was involved in both arbitrations, divorce himself from one of the two. Mr. Miller was promptly withdrawn from the Mary S arbitration. Mr. Cederholm also asked Mr. Carey to "confirm to all you are still prepared to proceed with the hearings scheduled for January 17th and 18th." Mr. Carey responded on January 16 that "the charterer will proceed with the introduction of evidence at the hearing scheduled for January 17th."

The latter hearing was cancelled due to a death in Mr. Cederholm's family. On January 26 Mr. Cederholm again wrote to Mr. Carey noting that "your letter of January 16th did not concede or acknowledge the propriety of me remaining as Chairman" and suggesting that, if he continued to be troubled by the situation, Mr. Carey's firm should consider withdrawing from the Mary S arbitration. Mr. Carey did not reply. One further hearing was held on June 6.

Mr. Cederholm was called as a witness in the Mary S arbitration, gave 80 pages of testimony, and was vigorously cross-examined by Mr. O'Brien of Hill Rivkins.

On July 1, 1979, the arbitrators in the Ross Isle arbitration rendered a unanimous decision in favor of the owner. The charterer filed this petition to vacate.

### III.

The basis for the motion to vacate is the "appearance of bias" created by Mr. Cederholm's dual role.[1] See 9 U.S.C.A. § 10(b) as construed by Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968). The owner insists that the award may be vacated only if "evident partiality" by the arbitrator is established.

A majority of the Court in Commonwealth Coatings concurred in holding

---

1. I have considered the argument that by proceeding with the arbitration despite its objections, and by failing to enunciate its objections at every occasion, the charterer waived those objections. I reject this argument.

Charterer's counsel were interested in an unbiased arbitration. They were also interested in a successful arbitration. Once the objections to the arbitrator had been enunciated and turned down, the next opportunity which the charterer had to raise his objection, without imperilling its chances of success in the arbitration, was in the petition to this court, which only could be made after the arbitrators had issued their award.

It could also be argued that the charterer waived its objection to the Cederholm-Haight Gardner relationship when Mr. Cederholm disclosed on September 6th his firm's retention of Haight Gardner in connection with "one P&I case of ours" and the charterer declined an invitation to make further inquiry and allowed the arbitration to proceed. The events of December 8 and 9, however, added new dimensions to the relationship: Mr. Cederholm became personally involved and it became likely that he would work closely with a Haight Gardner attorney in preparing to testify. The charterers no doubt declined to make further inquiry on September 6 because they were confident that, had Mr. Cederholm personally had any substantial contact with the "P&I" case which was the subject of disclosure, the nature of that contact would also have been disclosed.

that when facts reasonably creating the appearance of partiality are undisclosed, the award may be vacated; there is no need to probe the mind of the arbitrator nor to identify evidence of actual bias. *Sanko S.S. Co. v. Cook Industries, Inc.*, 495 F.2d 1260, 1263 (2d Cir. 1973); *Overseas Private Investment Corp. v. Anaconda Co.*, 418 F.Supp. 107 (D.Colo.1976). In order for arbitration to remain effective, arbitrators must not only be honest, but also above suspicion.

■ Disclosure alone does not discharge the arbitrator's responsibility. If the disclosure gives rise to a well-founded objection, the arbitrator must disqualify himself. "The point is, obviously, that disclosure is necessary to afford grounds and opportunity for objection." *Miserocchi v. Peavey International Inc.*, 78 Civ. 1571 (S.D.N.Y. Sept. 15, 1978) (Frankel, J.).[2]

■ An arbitration award is presumptively valid. The burden therefore rests on the party asserting the appearance of bias. *Reed and Martin, Inc. v. Westinghouse Electric Corp.*, 439 F.2d 1268 (2d Cir. 1971). I find that the charterer has met that burden. The totality of Mr. Cederholm's relationship to both law firms handling the Ross Isle matter created the appearance of bias. While the most compelling case for disclosure and disqualification is undoubtedly an arbitrator's direct involvement with a party, an arbitrator's involvement with attorneys representing a party may also create the appearance of bias. *Sanko S. S. Co. v. Cook Industries, Inc., supra* at 1263 (proof of substantial and continuous contacts between attorney and arbitrator might require vacation of award).

The subtle biases which sometimes arise out of a working or an adversarial relationship with an attorney may unconsciously be transferred to the client he represents. The arbitrator's exposure to the facts and issues in arbitration, after all, is through the attorneys and not through the parties; his rapport and ability to communicate with the attorneys may well have a substantial impact on the course of a proceeding.

In this case there was not only a potential for bias in favor of the owner but also a potential for bias against the charterer. The risk that potential might become actual bias was aggravated by Mr. Cederholm's active involvement in the Mary S case, resulting in his consultation with the owner's counsel and his cross-examination by the charterer's counsel. The relationship between a witness and the lawyer cross-examining him may be an intensely adversarial one.[3]

■ The owner suggests, relying on the decision of Judge Haight in *Transmarine Seaways Corp. v. Marc Rich & Co. A. G.*, 480 F.Supp. 352 (1979), that the only basis for finding partiality in an arbitrator is his direct financial or professional interest in a party. I find this criterion arbitrarily limiting. The concept of bias encompasses infinitely more than a financial relationship; surely no one would contend that a blood relationship between the arbitrator and a party or his attorney or an arbitrator's strong racial, political or other prejudice against a party or his attorney would fall outside its scope. The overwhelming concern with financial relationships reflected in the cases is simply a function of the frequency with which they occur in a commercial setting and the relative ease with which they can be identified. I read the cases not as requiring indications of financial dealings, but as requiring strong indications of potential bias of whatever nature.

---

**2.** Judge Frankel's decision emphasizes how easy and costless it is to replace an arbitrator when proper disclosure is made and exception taken at the outset of arbitration. It would probably be reasonable to require a stronger showing of potential bias when the bias does not arise until substantial money and effort have been invested in arbitration proceedings. In any event, I find that the showing made in this case was strong enough to have merited replacement of Mr. Cederholm even though some testimony had already been taken.

**3.** It is not clear from the record, and was never made clear despite a request from the court at the time of oral argument, at precisely what stage in the Ross Isle arbitration Mr. Cederholm testified before the Mary S arbitrators.

Once it is recognized that financial relationships are not the only suspect ones, it becomes evident that the relationships to which the charterer in this case objected were far more "substantial" than most of those involved in the cases relied on by the owner. In *Andros Compania Maritima, S. A. v. Marc Rich & Co., A. G.*, 579 F.2d 691 (2d Cir. 1978), affirming confirmation of an arbitration award, the district court had found that the disputed relationship between an arbitrator and the president of one of the parties' domestic agents was a relationship confined almost exclusively to their shared experiences as arbitrators. *Id.* at 701.[4] Even repeated contacts of a nonpartisan, disinterested nature like the contacts among arbitrators are unlikely to give rise to the appearance of bias. In this case, by contrast, the contacts were of an exceedingly partisan nature. In *Transmarine, supra*, at 358, "[the arbitrator's] company represented another company which in turn asserted a claim (entirely unrelated to those at the bar) against [the complaining party]." This case is distinguished from *Transmarine* by the greater number of potential conflicts affecting Mr. Cederholm (conflicts involving both parties) and by his personal involvement in the arbitration giving rise to those conflicts.[5]

■ I recognize the policy of insulating arbitration proceedings as much as possible from interference by the courts. It is in implementation of this policy that the courts have insisted on proof of a substantial potential for bias before considering vacation. I find, however, that the unusual conjunction of contacts by Mr. Cederholm personally with both law firms participating in the arbitration before him brings this within that special class of cases requiring vacation.[6]

So ordered.

---

4. The court of appeals also emphasized that the relationship would have been obvious upon the most superficial inquiry—finding, in effect, a constructive waiver. *Id.* at 702. In this case, the relationship did not arise until after arbitration had begun, and objection was made almost immediately thereafter.

5. I disagree with the reasoning and the outcome of another case on which the owners have placed considerable reliance, *Standard Tankers (Bahamas) Co. v. Motor Tank Vessel, AKTI*, 438 F.Supp. 153 (E.D.N.C.1977). The court in that case held that "to constitute evident partiality, some overt misconduct or demonstration of partiality is required"—a holding which seems to me inconsistent with the Supreme Court's decision in *Commonwealth Coatings*. I would have found the lawyer-arbitrator's litigation connections with both parties to the arbitration ample grounds for vacating the award in *Standard Tankers*.

6. The maritime community in New York is a relatively small one. It is certainly desirable that arbitrators in maritime matters be conversant with maritime customs and practices and hence it is inevitable that they will be drawn from various phases of active business practice in that community. It follows that a certain measure of interrelationship between arbitrators and parties or their counsel may exist or may develop. In normal course these can effectively be handled through the practices of disclosure and waiver (as was done with respect to the original interrelationship in the case at bar involving Elwell's P&I case and Haight Gardner). The extent and nature of the interrelationships which developed in the course of the S. S. Ross Isle arbitration rendered them not susceptible to such effective handling.