[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 01-11864

D.C. Docket Nos. 99-01992 CV-AR-S
and 99-013149 CV-AR-S

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 13, 2002
THOMAS K. KAHN
CLERK

UNIVERSITY COMMONS-URBANA, LTD.,
CAPSTONE DEVELOPMENT CORP.,

Plaintiffs-Counter-
Defendants-Appellees,

versus

UNIVERSAL CONSTRUCTORS INC.,
RELIANCE INSURANCE COMPANY,

Defendants-Counter-
Claimants-Appellants.

UNIVERSAL CONSTRUCTORS INC.
RELIANCE INSURANCE COMPANY,

Plaintiffs-Appellants,

versus

UNIVERSITY COMMONS-URBANA
CAPSTONE DEVELOPMENT CORP., its General
Partner,

Defendants-Appellees.

Appeal from the United States District Court

**(September 13, 2002)**

Before TJOFLAT and BIRCH, Circuit Judges, and GOLDBERG\*, Judge

TJOFLAT, Circuit Judge.

In this appeal, Universal Constructors, Inc. ("Universal") and Reliance Insurance Company ("Reliance") challenge a district court order confirming an arbitration award entered in favor of University Commons-Urbana, Ltd. ("University Commons") and Capstone Development Corporation ("Capstone Development"). One of the grounds of appellants' challenge is that a member of the arbitration panel was not impartial. The district court rejected this ground on its face, without holding an evidentiary hearing. We conclude that appellants' allegations of partiality are sufficient to warrant an evidentiary hearing. We therefore vacate the award and remand the case so that an evidentiary hearing may be held and findings of fact and conclusions of law may be made concerning the issue.

---

\*Honorable Richard W. Goldberg, U.S. Court of International Trade Judge, sitting by designation.

I.

University Commons is an Illinois-based limited partnership formed by

Capstone Development, a Birmingham-based developer that specializes in student-

oriented apartment projects for colleges and universities throughout the United

States. Some of Capstone's projects are developed "on campus" in conjunction

with colleges and universities, while others are developed "off campus" through a

limited partnership. University Commons was just such a partnership, formed to

develop an off-campus apartment project (the "Project") near the University of

Illinois, in Urbana.

In September 1997, University Commons contracted with Universal to build

these apartments. Specifically, the contract called for Universal to erect 132 four-

bedroom and 108 two-bedroom student apartment units, a club house, a swimming

pool, a maintenance building, and a duplex. Reliance acted as Universal's surety

and issued a $13,218,664 performance bond guaranteeing Universal's performance

of the Project.

The Project was scheduled for completion in August 1998. Universal did

not meet this deadline, however. On April 1, 1999, with the pool unfinished and

landscaping work still to be done, Capstone Development sent Universal a notice

terminating their contract on the ground that Universal's failure to complete the job

on time constituted a material breach. Later that month, Capstone Development hired Capstone Building Corporation ("Capstone Building") to complete the job. Capstone Building completed the project by July 31, 1999.

On June 14, 1999, University Commons filed a Demand for Arbitration with the American Arbitration Association ("AAA"), alleging breach of contract against Universal. University Commons sought $3,649,669.98 in damages from Reliance under the Performance Bond, including $286,899 for deductive change orders, $555,285.34 for the cost of repairing, replacing, or completing Universal's work, and $3,307,485.64 for the damage allegedly caused by Universal's failure to complete the project on schedule. The bulk of this $3,307,485.64 that Universal sought as compensation for the delay was lost rental income, specifically $1,099,464 for the 1998-1999 school year and $1,989,700 for the 1999-2000 school year.

University Commons and Capstone Development presented these same claims and sought these same damages in a law suit they brought in the United States District Court for the Northern District of Alabama on July 30, 1999. The court stayed prosecution of the case on December 7, 1999, after the parties mutually consented to submit the case to arbitration.

In August 1999, the AAA provided the parties with a list of fifteen possible

4

arbitrators and their resumes. Each party had the right to strike five of the arbitrators on a peremptory basis and rank the remaining names on the list in order of preference. The AAA would then fashion a tribunal based on the parties' preferences. In the arbitration in this case, styled University Commons-Urbana, Ltd. c/o Capstone Development Corp. and Universal Constructors, Inc., and Reliance Insurance Company, the AAA ultimately named a panel comprised of three arbitrators, including Edward P. Meyerson, an experienced construction attorney.

The arbitration itself ran from April to June 2000 and was conducted in three parts. During the first set of hearings, from April 17 to April 25, 2000, University Commons set forth its case-in-chief. Then, from June 1 until June 8, 2000, the hearings continued into a second session as Universal and Reliance presented their case-in chief. Finally, the hearings resumed for a third time from July 10 to July 12, 2000, for the parties' rebuttals and closing arguments.

Prior to the arbitration hearings, the parties held several telephone conference calls with the arbitrators to discuss scheduling and the depositions that needed to be taken. During none of these calls, the first of which occurred on November 11, 1999, did Meyerson disclose any involvement with the parties, their witnesses, or their counsel – Bradley Arant Rose & White LLP ("Bradley Arant"),

5

counsel for University Commons, and Smith, Currie & Hancock LLP, counsel for Universal. In fact, Meyerson never made any written disclosure of any kind indicating that he had a financial or personal interest which might affect his partiality.

At the start of the arbitration hearings on April 17, 2000, Meyerson indicated, however, that he knew and had worked with and against the attorneys and law firms who represented both sides in the arbitration. This would not be Meyerson's last disclosure: During the course of the arbitration hearings, he also would reveal other previous contacts with people who had interests in the arbitration. For instance, at some point during the arbitration process, Meyerson informed the parties that he had met with a representative from Capstone Building to discuss possible legal representation.[1] In addition, at the end of the hearings, when Jeff Schattinger, Capstone Development's construction manager, appeared to testify, Meyerson acknowledged that he had met Schattinger previously. Despite these disclosures, there is no evidence in the record that Universal or Reliance objected to Meyerson's role as an arbitrator during any stage of the arbitration

---

[1] The parties contest when Meyerson made this disclosure: Meyerson and University Commons insist that Meyerson revealed his contact with Capstone Building at the initial arbitration hearing; whereas, Ronald Robey, an attorney for Universal, insists that Meyerson made no mention of it until the second series of arbitration hearings.

hearings.

On August 17, 2000, the arbitrators rendered their decision, awarding $2,248,648 to University Commons along with 12% interest per annum accruing from August 15, 2000. Universal and Reliance received nothing on their counterclaims. The arbitrators did not otherwise itemize the award of damages, though. Consequently, they gave no indication as to what portions of the $3,649,669.98, which University Commons originally sought in damages, they thought had merit.

Little time passed, however, before the award was challenged. On August 30, 2000, Universal and Reliance filed a petition to vacate the award in the United States District Court for the Northern District of Georgia. University Commons countered and filed a motion to confirm the award in the still pending litigation (which had been stayed) in the Northern District of Alabama. On October 23, 2000, the district court in Georgia issued an order sua sponte transferring its case to the Northern District of Alabama, and the district court there consolidated the two cases the following month.

On December 15, 2000, the parties met in accordance with Rule 26(f) of the

Federal Rules of Civil Procedure,[2] and the district court ordered them to proceed

with limited discovery, to be completed by March 5, 2001. On January 9, 2001,

Universal served University Commons with a set of discovery materials, including

a First Request for Admissions, First Interrogatories, and a First Request for

Production of Documents.[3] Arguing that "the Federal Arbitration Act does not

---

[2] Rule 26(f) provides:
Except in categories of proceedings exempted from initial disclosure under Rule
26(a)(1)(E) or when otherwise ordered, the parties must, as soon as practicable and
in any event at least 21 days before a scheduling conference is held or a scheduling
order is due under Rule 16(b), confer to consider the nature and basis of their
claims and defenses and the possibilities for a prompt settlement or resolution of
the case, to make or arrange for the disclosures required by Rule 26(a)(1), and to
develop a proposed discovery plan that indicates the parties' views and proposals
concerning:
    (1) what changes should be made in the timing, form, or
requirement for disclosures under Rule 26(a), including a statement as
to when disclosures under Rule 26(a)(1) were made or will be made;
    (2) the subjects on which discovery may be needed, when discovery
should be completed, and whether discovery should be conducted in
phases or be limited to or focused upon particular issues;
    (3) what changes should be made in the limitations on discovery
imposed under these rules or by local rule, and what other limitations
should be imposed; and
    (4) any other orders that should be entered by the court under Rule
26(c) or under Rule 16(b) and (c).
Fed. R. Civ. P. 26(f).

[3] Universal actually served University Commons with a nearly identical set
of discovery materials on December 28, 2000, but soon thereafter discovered
technical irregularities with one of its requests. Therefore, it resubmitted the
materials, corrected, to University Commons on January 9.

authorize initial disclosures or discovery in connection with a Motion to Confirm or Vacate an arbitration award," University Commons objected to Universal's requests, but nonetheless purported to respond to them on February 7, 2001.

In this February 7 response to Universal's discovery requests, however, University Commons refused to respond to most of Universal's interrogatories and declined most of Universal's requests for admissions and documents. To illustrate, of the twelve admissions Universal requested, University Commons denied possessing the knowledge to answer eleven of them – all of which dealt with whether Meyerson took part in various litigation in which Bradley Arant served as counsel. Similarly, University Commons objected to fifteen of the eighteen interrogatories that Universal submitted, because they sought information on interactions between Meyerson and Bradley Arant and, according to University Commons, "[Bradley Arant] is not a party and has no obligation to respond." Furthermore, with regard to two of the other three interrogatories, which sought information regarding Meyerson's previous dealings with Capstone Building and Schattinger, University Commons professed to know no more than what was previously revealed at the arbitration hearings.[4] Not surprisingly, all of Universal's

---

[4] The one interrogatory that involved information clearly within University Commons' direct possession asked University Commons to "[i]dentify all business, professional, civic, social, or other relationships and contacts during the

9

requests for documents, which sought materials relevant to each of the interrogatories, were refused by University Commons.

Unhappy with University Commons' response to its discovery requests, Universal moved the court to compel discovery pursuant to Rule 37(a) of the Federal Rules of Civil Procedure. At a hearing on the motion, the court, on its own initiative, chose to revisit whether discovery should have been allowed at all. It decided that its initial decision to allow discovery was incorrect and that it should confirm the arbitration award without further debate.[5] Therefore, the court, on

_____

relevant time period between Edward P. Meyerson and University Commons." In response, University Commons said that it was "not aware of any such relationships or contacts other than Mr. Meyerson's service as an arbitrator [in this case]."

[5] The court's reasons for changing its opinion are a bit muddled, but seem to be motivated, at least in part, by a desire that this court confront the issue:

> And so forcing me, when this was presented, to go back to look at what the situation is, I think that while it's an intriguing thing, it was to start with, with me, I think it's the kind of thing that if you want to pursue it, it ought to be pursued now and with the Eleventh Circuit. There's no point in my trying this case all over again one way or another and then having one of you go to the Eleventh Circuit, when you can go now and the way and the avenue and the vehicle to go is for me to agree with the arbitration award and let you all get the Eleventh Circuit to tell me, if they want to, that I'm wrong. And it won't be the first time I've been told that, and it won't hurt my feelings. So the plaintiffs in my court won't hurt my feelings by getting me reversed.

Consequently, the court allowed the parties one week, from February 28 to March 1, to file further materials in the record before it issued a dispositive order.

10

March 8, 2001, entered a final judgment confirming the arbitration award. Universal and Reliance now appeal.

## II.

Universal and Reliance have posited two separate reasons for us to overturn the district court's decision confirming the arbitration award. First, they claim that the arbitrators, by awarding lost rental income for the 1999-2000 school year even though the project was completed before this time period began, acted in "manifest disregard for the law." Second, Universal and Reliance assert that Meyerson's previous contacts with Bradley Arant, Capstone Building, and Schattinger demonstrate enough prima facie evidence of Meyerson's evident partiality that the district court should have allowed discovery to continue. We consider the district court's rulings as to both of these arguments using a mixed standard: We review district court's factual findings for clear error and its legal conclusions de novo. Gianelli Money Purchase Plan and Trust v. ADM Investor Servs., 146 F.3d 1309, 1310-11 (11th Cir. 1998) (discussing the standard of review for orders confirming and negating arbitration awards).

## A.

In Montes v. Shearson Lehman Bros., Inc., 128 F.3d 1456 (11th Cir. 1997), we joined other circuits in holding that an arbitration decision could be vacated if

the arbitrators, in making their decision, acted in "manifest disregard of the law." In reaching our conclusion, however, we emphasized that only "a manifest disregard for the law, in contrast to a misinterpretation, misstatement or misapplication of the law, can constitute grounds to vacate an arbitration decision." Id. at 1461-62.  In other words, "[t]o manifestly disregard the law, one must be conscious of the law and deliberately ignore it."  Brown v. ITT Consumer Fin. Corp., 211 F.3d 1217, 1223 (11th Cir. 2000) (quoting Montes, 128 F.3d at 1461). Consequently, "there must be some showing in the record, other than the result obtained, that the arbitrators knew the law and expressly disregarded it."  O.R. Sec., Inc. v. Prof'l Planning Assocs., Inc., 857 F.2d 742, 747 (11th Cir. 1988).

Unfortunately, in the instant case, we have no showing in the record of the arbitrator's thoughts – other than the result.  Universal and Reliance contend that the arbitrators acted in manifest disregard for the law by awarding damages that included lost rent for the 1999-2000 school year because the Project was completed before the school year even began.  But we cannot ascertain from the bare-bones statement of the award what principle of law the arbitrators purportedly chose to ignore when they awarded this rent.[6]  The statement simply lists the amounts

_____

[6]  We cannot even tell for certain from the wording of the award whether the arbitrators awarded the lost rent at all.  The award simply says that Universal and Reliance should pay $2,248,648 to University Commons, but does not indicate

12

awarded to each party and is devoid of any mention of cases or treatises that might have provided the underpinnings for the arbitrators' decision. Furthermore, since the hearings were not transcribed, we cannot even look at questions or offhand remarks by the arbitrators for possible evidence of their legal rationale. In sum, we have no indication of the arbitrators' reasons for awarding the lost rent, and, thus, we have no reason to believe that they disregarded the law in doing it. See id. ("In fact, when the arbitrators do not give their reasons, it is nearly impossible for the court to determine whether they acted in disregard of the law.")

This logic seems especially apt in a situation like the one before us, where there does not appear to be any clear rule of law that the arbitrators might have transgressed. There is, at least, some case law suggesting that delay damages can be awarded for intervals after the completion of a construction project, if "the residual effects of non-performance of the contract are carried over into a period when the building is operational." See Perini Corp. v. Greate Bay Hotel & Casino,

---

why that sum was chosen. Since University Commons sought $3,649,669.98 – $1,989,700 of which was for lost rent for the 1999-2000 school year – one might assume that an award greater than $1,659,969.98 – the difference between the total sum sought and the figure for lost rent – would include some measure of damages for that rent. This assumption only holds true, however, if the arbitrators, in their calculation of the award, did not deviate from the accounting prepared by University Commons. There is no way to determine whether the arbitrators made such a deviation when they computed damages.

Inc., 610 A.2d 364, 379 (N.J. 1992) (upholding an arbitration award that awarded delay damages to a casino for its fall revenue after its renovation was substantially complete in the summer because, among other reasons, "the possibility that the public perception of the [casino] during the critical summer months could have had a significant impact on [its] operations in the fall"), abrogated on other grounds by Tretina Printing, Inc. Fitzpatrick & Assocs., Inc., 640 A.2d 788 (N.J. 1994) (adopting narrower grounds on which arbitration awards may be vacated). While we do not necessarily concur with this view, we would be hard-pressed to say, without evidence of the arbitrators' thinking, that they consciously ignored the law in deciding the matter at hand.[7]

Ultimately, due to both the paucity of the record and the unsettled nature of the law on delay damages, we cannot find proof that the arbitrators recognized a clear rule of law and, furthermore, chose to ignore it. Therefore, we cannot find that the arbitrators acted in manifest disregard for the law by awarding damages that included lost rent for the 1999-2000 school year.

---

[7] Theoretically, we suppose, the arbitrators' approach to the award of damages could be in disregard of the law altogether, if it differed from the provisions of the contract. Unfortunately for the appellants, while the case law on contract interpretation is well-developed, we have no way to determine if the arbitrators acted in knowing disregard of this case law because the contract was not entered into the record.

B.

Section 10 of the Federal Arbitration Act provides that a federal district court may vacate an arbitration award "[w]here there was evident partiality or corruption in the arbitrators . . . ." 9 U.S.C. § 10(a)(2). This rule is meant to be applied stringently. As the Supreme Court emphasized in the seminal case of Commonwealth Coatings Corp. v. Cont'l Cas. Co., 393 U.S. 145, 89 S. Ct. 337, 21 L. Ed. 2d 301 (1969), courts "should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review." Id. at 149, 89 S. Ct. at 339.

To maintain this sense of impartiality, the law imposes "the simple requirement that arbitrators disclose to the parties any dealing that might create an impression of possible bias." Id. The key word in this rule is "impression." "Whether the arbitrator's decision itself is faulty is not necessarily relevant." Woods v. Saturn Distrib. Corp., 78 F.3d 424, 427 (9th Cir. 1996). Disclosure ensures that parties can view arbitration as a substitute for litigation, even though the former is not bound by the same strictures of procedure and formality as the latter. This practice, correspondingly, has been adopted by the various bodies that oversee arbitrations. For example, under Rule 19 of the version of the AAA's

15

Construction Industry Arbitration Rules which were in effect at the time of this case,[8] "[a]ny person appointed as neutral arbitrator shall disclose to the AAA any circumstance likely to affect impartiality, including any bias or any financial or personal interest in the result of the arbitration or any part or present relationship with the parties or their representatives." Meyerson, therefore, had a duty to disclose any potential conflicts he had to all of the parties.

Universal and Reliance contend that he failed this obligation by providing insufficient disclosures on three separate areas: (1) his previous legal interactions with the Bradley Arant law firm in various mediations, arbitrations, and litigations; (2) his interview with Capstone Building; and (3) his acquaintanceship with Jeff Schattinger. We consider each in turn, keeping in mind the standard we have established in this Circuit through our earlier cases. That is, "an arbitration award may be vacated due to the 'evident partiality' of an arbitrator only when either (1) an actual conflict exists, or (2) the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists." Gianelli Money Purchase Plan & Trust v. ADM Investor Servs.,

---

[8] Revised on July 1, 2001, the current version of the Construction Industry Arbitration Rules, now called the Construction Industry Dispute Resolution Procedures because they incorporates rule for both mediation and arbitration, still contains this language verbatim, but as Rule 20.

Inc., 146 F.3d 1309, 1312 (11th Cir 1998) (citing Lifecare Int'l, Inc. v. CD Med., Inc., 68 F.3d 429, 433 (11th Cir. 1995) and Middlesex Mut. Ins. Co. v. Levine, 675 F.2d 1197, 1202 (11th Cir. 1982)).

1.

It is undisputed that, at the onset of the initial set of arbitration hearings in this case, Meyerson disclosed that he knew and had worked with the law firms representing both parties in this arbitration. It is also undisputed that neither party objected to Meyerson continuing as an arbitrator at that time. What Universal and Reliance now contend is that Meyerson's disclosure was inadequate and possibly misleading – and thus, their own failure to object did not constitute waiver – because Meyerson did not reveal the allegedly extensive nature of his relationship with Bradley Arant. To determine whether Meyerson's disclosure was sufficient, we logically must conduct a two-step analysis: first, we must determine what Meyerson needed to disclose; then, we must consider what he did disclose.

As we have noted in our previous cases, an arbitrator is obligated to disclose those facts that "create a reasonable impression of partiality," Lifecare Int'l, 68 F.3d at 433 (citation omitted), or put another way, "information which would lead a reasonable person to believe that a potential conflict exists." Gianelli Money Purchase Plan & Trust, 146 F.3d at 1312. The partiality alleged must be "direct,

17

definite and capable of demonstration rather than remote, uncertain and speculative." Levine, 675 F.2d at 1202 (citation omitted). Here, the purported partiality about which Universal and Reliance complain arises out of several arbitrations, mediations, and litigations in which Meyerson and Bradley Arant both took part. In examining these legal interactions, we may need to use different standards, however, depending on when they occurred – that is, whether they occurred prior to or concurrent with the arbitration between the parties in this case.

To illustrate, we first consider those occasions on which Meyerson and Bradley Arant participated in the same arbitrations, mediations, and litigations prior to the arbitration in this case. At first blush, a large number of such encounters would seem to imply an inappropriately close association between arbitrator and counsel. Closer inspection reveals, however, that frequent interactions between Meyerson and Bradley Arant may simply be the result of the fact that both specialize in construction law in Birmingham, Alabama. Such familiarity due to confluent areas of expertise does not indicate bias. Rather, so long as the previous interactions do not represent part of an ongoing business relationship, it may be an asset, since "an arbitrator's experience in an industry, far from requiring a finding of partiality, is one of the factors that can make arbitration a superior means of resolving disputes." Scott v. Prudential Sec., Inc., 141 F.3d

18

1007, 1016 (11th Cir. 1998) (citing Commonwealth Coatings Corp., 393 U.S. at 150, 89 S. Ct. at 340 (White, J., concurring) ("It is often because they are men of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function.")).  Therefore, standing alone, the fact that an arbitrator, like Meyerson, had previous contacts with counsel for one of the parties does not suggest evident partiality.

On the other hand, a reasonable person might envision a potential conflict if an arbitrator, *concurrently with the arbitration*, partakes in a proceeding in which counsel for one of the parties to the arbitration is also participating.  Compare Continental Ins. Co. v. Williams, No. 84-2646-Civ-Marcus, 1986 WL 20915, at *5 (S.D. Fla. Sept. 17, 1986) (finding evident partiality where an arbitrator failed to disclose that, concurrent with the arbitration, he was representing a plaintiff in another, unrelated litigation against the insurance company, who was the defendant in the arbitration), with Lozano v. Maryland Cas. Co., 850 F.2d 1470, 1472 (11th Cir. 1988) (contrasting the facts in its case with those in Williams and finding that no evident partiality existed where an arbitrator failed to disclose his law firm's representation of adversaries of the arbitral defendant in two state court cases, partly because "there [was] no evidence that [the arbitrator] was even aware that these cases existed or that the two cases were . . . active at the time the arbitration

19

proceedings took place.") Whether he acts as co-counsel or opposing counsel in a mediation, litigation or other arbitration, the arbitrator could seem biased, and his ruling in the arbitration could be seen as a way to curry favor in the other matter. For this reason, we are troubled by appellants' claim that Meyerson, while the arbitration was ongoing, represented a co-defendant in the state court case of The Parliament House, LLC v. Danny Lee Munden d/b/a Painting by Munden with David Pugh, a Bradley Arant attorney who individually represented University Commons. If this allegation is true, then Meyerson, at least, would have appeared to be biased towards University Commons in its dispute with Universal and Reliance. Admittedly, "the mere appearance of bias or partiality is not enough to set aside an arbitration award," Lifecare Int'l, 68 F.3d at 433, but it should have been enough to require the district court to hold an evidentiary hearing.

Of course, this, or any other, instance of alleged partiality would be moot if Meyerson had disclosed it to the parties. Had Universal or Reliance failed to contest Meyerson's status as an arbitrator at that time, they would have waived the right to object in the future. Waiver, however, "applies only where a party has acted with full knowledge of the facts," Levine, 675 F.2d at 1204, and, as the record in this case stands now, it seems unlikely that Universal or Reliance knew the extensive nature of Meyerson's previous and concurrent interactions with the

20

lawyers of Bradley Arant at the time of the arbitration. The affidavits that have been submitted by the parties simply say, without detail, that Meyerson indicated that "he knew and worked with the law firms representing the parties in this arbitration;" there is no suggestion that he provided any specific details about these interactions, including the fact that one was ongoing.

As we noted earlier, Gianelli Money Purchase Plan & Trust holds that one scenario under which an arbitration award could be vacated would be if "the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists." Gianelli Money Purchase Plan & Trust, 146 F.3d at 1312 (citations omitted). This standard can be further distilled into three key elements: (1) the arbitrator must be aware of the facts comprising a potential conflict; (2) the potential conflict must be one that a reasonable person would recognize; and (3) the arbitrator must fail to disclose the conflict. While we did not make it clear in Gianelli Money Purchase Plan & Trust, it seems logical that, like the second element, the third element – whether or not the arbitrator disclosed the conflict – should be governed by a reasonable person standard. In other words, for an award to be vacated, the arbitrator must not have disclosed enough information for a reasonable person to realize that a potential conflict existed. Otherwise, the party would have – or, at least, should have –

21

recognized the conflict at the time of the disclosure, and promptly objected.

In the case at hand, Universal and Reliance have presented prima facie proof of each of these elements. First, Meyerson knew or should have known that a potential conflict existed, as soon as David Pugh, his co-counsel in a pending state court action, appeared before the arbitral panel as counsel for University Commons.[9] After all, serving as the decision-maker in one action in which a colleague in another action represents a party clearly poses the possibility of bias, and thus represents a potential conflict that a reasonable person would easily recognize. Moreover, as the record appears before us, Meyerson did not disclose the relationship to the parties with enough specificity for them reasonably to understand that a potential conflict existed. In sum, Meyerson's alleged actions constituted prima facie grounds for vacatur of the arbitration award.

At this point, the district court should have plunged headlong into evidentiary fact-finding. See Legion Ins. Co. v. Ins. Gen. Agency, Inc., 822 F.2d 541, 542-43 (5th Cir. 1987) ("[S]ome motions challenging arbitration awards may

_____

[9] In his declaration, Meyerson noted that, at the time of his appointment to the arbitration panel, only James Archibald and Ron Robey were listed as counsel for the parties (i.e., Archibald for University Commons and Robey for Universal). This fact may show why Meyerson initially did not believe he had a potential conflict with either party, but it does not explain why he did not disclose his relationship with Pugh once he learned that Pugh would be participating in the arbitration.

require evidentiary hearings outside the scope of the pleadings and arbitration record. . . . Such matters as misconduct or bias of the arbitrators cannot be gauged on the face of the arbitral record alone."); In re Sanko S.S. Co., Ltd. v. Cook Indus., Inc., 495 F.2d 1260, 1262-63 (2d Cir. 1973) (finding discrepancies regarding an arbitrator's possible conflicts and his disclosures about those conflicts, and deciding that "[t]hese discrepancies require that [the] case be remanded so that an evidentiary hearing may be held and the full extent and nature of the relationships at issue may be ascertained.")  University Commons and Capstone Development could have presented evidence to rebut the prima facie case set forth by Universal and Reliance, either by contesting the factual accuracy of their claims or by somehow demonstrating facially that no undisclosed, potential conflict existed even if the facts Universal and Reliance allege are true.  Likewise, however, Universal and Reliance could have tried to provide proof that Meyerson's interactions with Bradley Arant, which, by themselves, do not establish a potential conflict, are part of an established, ongoing relationship between appellee's counsel and himself, which, indeed, might pose a potential conflict.  Of course, discovery would have been needed as to all of these issues.

Unfortunately, the district court took none of these steps.  Instead, as soon as it grasped the somewhat complex task at hand, or in its own words, "where this

23

was going to lead," it chose to curtail any evidentiary inquiry and rely upon an order it had recently issued in another case, <u>Clark v. Alfa Insurance Company</u>, for the proposition that contacts outside of an arbitration between an arbitrator and a counsel for a party to that arbitration do not pose a conflict of interest.[10] As our

---

[10] Specifically, at the hearing, the district court said:

> In the <u>Clark v. Alfa</u> case, the plaintiff's lawyer in this case had, according to the allegations of the motion to disqualify him filed by Alfa, then a mediator in a case involving Alfa, and a similar case to this one in which some of the issues were the same, perhaps some of the cast of characters were the same, and Alfa's position was that the familiarity with the modus operandi of Alfa acquired by plaintiff's lawyer as a mediator, albeit a successful mediator, and in particular, a successful mediator who spent considerable time exploring the various aspect of that particular matter, gave him an unfair advantage because he now knows, according to Alfa, how they think. And that gives him an advantage that is undue and presents a conflict of interest.

> I said in my opinion that it was close and that it was difficult and that I couldn't find any cases right on point. And I couldn't. There might be some, but I didn't find them. But after struggling with it, I reached the conclusion that the lawyer for the plaintiff was not disqualified. And basically my rationale was the domino effect. How far does it go?

> Does the plaintiff's lawyer in this case, does his former law firm with which he was affiliated when he was a mediator, is it disqualified against Alfa and in what kind of cases? And are all members of his present firm disqualified even though they weren't affiliated with him at the time he was a mediator?

> And I said, or I should have said, I think I did say, that under

24

previous discussion intimates, we disagree with this theory of law. Rather, we

believe that interactions between an arbitrator and a party's counsel, especially

---

that theory a person who holds himself out as a mediator should anticipate that that's all he can ever do, be a mediator. He's got to be in a pure mediating firm. And people like Rodney Max, I didn't call his name in there, who constantly and 100 percent mediate, are infecting their firm with the inability to represent anybody in a case in which Rodney has been the mediator. So that you are going to create a narrow focus of people who can only mediate.

Well, I think maybe that rationale applies to arbitrators. So that if Ed Meyerson is competing with Rodney Max, except Rodney, while he does arbitration, he predominantly mediates, and Ed, I think, predominantly arbitrates, although he mediates too. But anytime he does that, and he's a member of a law firm, if you take that to its logical conclusion, or illogical conclusion, depending on how you want to view it, it creates an insurmountable problem of the kind that now is apparent in this case where the party who is seeking to avoid the effect of the arbitration award is suggesting and asking about every case in which Ed Meyerson has an interest as an arbitrator. And he's had a lot of them. And whether he's going to be faced with this kind of question of his ability to sit as an arbitrator in every case before and after the arbitration is a big question.

I guess what I'm saying is I'm ready to back up and rethink. And it may be, it may be precipitated if I rethink it, not by necessarily agreeing now summarily and immediately to enforce the arbitration award and to dismiss the attack on the arbitration, but to recognize the horror and to disallow and stop it of exploring this and without regard to all the niceties.

Unfortunately, the district court's order in Clark was neither published in the federal reporters nor entered into the record of the instant case, so we are unable to review it.

those concurrent with the arbitration, can pose a potential conflict. Although normally we might apply a new standard like this one to the factual findings of the district court – even as we are constrained to review those findings only for abuse of discretion – we cannot do so in this case, because the record is bereft of such findings. Therefore, we must leave this job in the hands of the district court on remand.

2.

As a second basis for its assertion that Meyerson's role as an arbitrator was compromised by evident partiality, Universal and Reliance have pointed to the meeting between Meyerson and Capstone Building. The district court made no mention of this potential source of conflict during the hearing it held on February 28, 2001, and thus, we cannot be certain what, if any, its thoughts were regarding it. Moreover, as with the other allegations in this case, the record is somewhat murky as to many facts regarding the meeting. Nevertheless, what we already know is somewhat troubling.

Evidently, sometime between the time that Meyerson was appointed as an arbitrator in <u>University Commons-Urbana, Ltd. c/o Capstone Development Corp. and Universal Constructors, Inc.</u> and the commencement of the arbitration, Meyerson met with Jay Chapman, president of Capstone Building. According to

26

Meyerson,[11] Chapman merely wanted to consult with Meyerson as to "whether his attorney at the time was handling an OSHA complaint properly." Meyerson also concedes, however, that Chapman asked him "whether [his] firm was able to do some corporate work for him in the future," but Meyerson declined.

Normally, that an arbitrator meets with a non-party about other business during the course of the arbitral process would hardly suggest evident partiality. This assumption presupposes, though, that a non-party would not have a pecuniary interest in the arbitration. Such may not be the case here. Approximately $500,000 of the damages University Common sought from Universal and Reliance involved the cost of work performed by Capstone Building to complete the Project. More importantly, Mike Mauron, the owner of Capstone Development, owns forty-nine percent of Capstone Building. Put another way, a party to the arbitration, with a significant stake in Meyerson's decision-making, owned nearly half of Capstone Building. Had the district court allowed discovery to continue, there is a chance that more evidence may have come to light showing an even closer affiliation

---

[11] On February 27, 2001, one day before the district court's scheduled hearing in this case, Meyerson filed a declaration, along with a motion to quash a deposition subpoena that had been issued to him. Based on the court's comments at that hearing, however, it is clear that the court decided to confirm the arbitration award before it had seen either the declaration or the motion and, therefore, found both to be moot.

between Capstone Building and Capstone Development.[12]

The connection between these two companies is not the only subject on which further fact-finding is necessary. We need additional information on Meyerson's disclosure of his meeting with Capstone Building. Unlike our foregoing discussion of Meyerson's disclosures about his previous legal interactions with Bradley Arant, however, we are not interested as much in *what* he said about his meeting with Capstone Building – both parties acknowledge that Meyerson told them he had met with a representative of Capstone Building about possible employment – as *when* he said it. Our reasons are twofold. First, whether Meyerson knew or should have known about a close affiliation between Capstone

---

[12] For example, Universal and Reliance have cited two articles in the <u>Birmingham Business Journal</u> that purportedly demonstrate a close relationship between Capstone Building and Capstone Development. The first reveals that Mauron purportedly started Capstone Building "as an offshoot of Capstone Development" and only gave Chapman, whom Mauron hired to run Capstone Building, a majority share of the ownership, when the workload became greater than either had originally planned. Carol Muse Evans, <u>Chapman's Dream Now His Reality</u>, Birmingham Bus. J., June 9, 2000, at 7. The second article quotes Chapman as admitting that "[t]he genesis of [Capstone Building] was to service [Mauron's] projects," with Mauron elaborating that "Capstone Development uses capstone Building as its general contractor as much as possible." Don Milazzo, <u>Fast Track 25 Winners Reveal Success Stories</u>, Birmingham Bus. J., May 5, 2000, at 8. Universal and Reliance have also alleged that, according to Capstone Building's portfolio, all of Capstone Building's completed and ongoing projects were developed by Capstone Development. Neither the articles nor the portfolio have been made a part of the record, however.

Building and Capstone Development at the time he made his disclosure is obviously relevant. After all, an arbitrator can only be held culpable for what he knows or should know, but fails to disclose. Also relevant is whether Meyerson delayed disclosing the meeting until it was unreasonable for Universal and Reliance to object to his participation in the arbitration. An arbitrator must disclose a potential conflict as soon as it becomes apparent; otherwise, delay and concealment would be encouraged. Cf. Levine, 675 F.2d at1204 ("To hold . . . that [a party] waived [its] right to contest the alleged impartiality of the neutral arbitrator because [it] did not discover evidence of partiality prior to arbitration would put a premium on concealment.") Meyerson claims he met with Chapman after he was appointed to the arbitration panel, but the parties disagree on when Meyerson informed them of this meeting; both University Commons and Meyerson claim that this disclosure occurred at the onset of the arbitration, while Universal and Reliance assert that Meyerson's announcement came during the second set of hearings. If the district court finds that Meyerson delayed making his disclosure until the arbitration had proceeded to the point that, given the amount of funds and resources they had invested in the proceeding, Universal and Reliance could not, as a practical matter, afford to object to Meyerson continuing as a member of the arbitration panel, then the court may well decide that Meyerson's

disclosure was insufficient to avoid vacatur.

3.

The third and final ground Universal and Reliance provide for claiming that Meyerson was compromised by evident partiality involves his belated recognition of Jeff Schattinger, an allegedly "principal" witness for University Commons. Schattinger was one of the most important witnesses to testify in the arbitration proceeding. When he appeared before the panel, Meyerson acknowledged that he had met him on a prior occasion. After the arbitration ended, Meyerson clarified that he had met Schattinger several years earlier during an arbitration proceeding, in which Meyerson was counsel and Schattinger testified as an expert witness for the opposing party.

Nevertheless, even without this late information, there was nothing so suspicious about the relationship between Meyerson and Schattinger – if it can be called a "relationship" – that should have prompted the district court to elicit further information. Meyerson merely realized, at the moment he first saw the witness face-to-face, that he had encountered him previously. Nothing about this fact suggests that Meyerson would have been partial to one side or the other as a

30

result. In fact, Meyerson's inability to recognize Schattinger until he appeared before the arbitration panel demonstrates the insignificance of their previous encounter. We cannot require district courts to review arbitration results every time an arbitrator discovers that a mere acquaintance is a witness. Hence, we find that the district court acted appropriately in finding that Meyerson's recognition of Schattinger did not represent prima facie grounds of evident partiality.

III.

In summary, while Universal and Reliance have not provided any grounds for its claim that the arbitration award in University Commons-Urbana, Ltd. c/o Capstone Development Corp. and Universal Constructors, Inc. represented a manifest disregard for the law, they have identified two separate bases for a prima facie case that the award should be vacated due to Meyerson's evident partiality: (1) his previous and – more problematically – concurrent legal interactions with the individual lawyers who represented University Commons in the arbitration, and (2) his meeting with Chapman, the president of Capstone Building. Nevertheless, due to the paucity and incomplete nature of the record before us, we cannot say whether vacatur is indeed warranted. "[T]he 'evident partiality' question

31

necessarily entails a fact intensive inquiry [as t]his is one area of the law which is highly dependent on the unique factual settings of each particular case." Lifecare Int'l, 68 F.3d at 435. What is needed now, therefore, is, an evidentiary hearing on these two allegations (in which we have found merit). From the evidence adduced at the hearing, the district court must determine two things: the relevant facts, and whether Meyerson adequately disclosed such facts. The district court's confirmation of the arbitration award is therefore VACATED and the case is REMANDED for further proceedings.

SO ORDERED.